MILITARY AUDIT PROJECT, Felice D. Cohen, Morton H. Halperin, Appellants,

v.

William CASEY, Director of Central Intelligence, et al.

No. 80–1110.

United States Court of Appeals, District of Columbia Circuit.

Argued 3 Feb. 1981.

Decided 4 May 1981.

Allan S. Hoffman, Washington, D. C., with whom Robert A. Seefried, Wash-

ington, D. C., was on the brief for appellants.

Marc Richman, Atty. Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellees.

Before PECK *, Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This case arises out of a Freedom of Information Act (FOIA or "the Act") request partially rejected by the government for reasons of national security. It is now before this court for the third time, already having commanded the attention of three district judges and outlasted three Directors of Central Intelligence. The appellants seek access to a wide variety of documents classified "Secret" regarding the *Glomar Explorer* project, ostensibly undertaken by the Central Intelligence Agency (CIA) for the purpose of raising a sunken Russian submarine from the floor of the Pacific Ocean. Having received almost two thousand pages of documentation in partial satisfaction of their request, the appellants now seek to compel the government to turn over much of what remains undisclosed. To justify withholding the requested documents the government has submitted to the district court extensive affidavits by high government officials detailing the nature of the material withheld and the implications for the national security should it be released. The district court found the affidavits sufficient to establish the government's right to withhold the documents under the Act, and therefore, without permitting further discovery by the appellants, granted summary judgment for the government. The present appeal followed.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

The appellants' principal contention on appeal is that prior official disclosures by the government about the *Glomar Explorer*, together with widespread but unofficial reports in the press, suggest both that much of the material still withheld is already in the public domain and that the release of what remains undisclosed would do little additional damage to the national security, if any. The government, on the other hand, contends that in spite of all the publicity the public may still not know even the true purpose of the *Glomar Explorer* mission, so that release of the withheld documents could pose a serious threat to the national security. The government argues that its affidavits are sufficient to establish that no genuine issues of material fact remain regarding whether the deleted documents are exempt from disclosure under the Freedom of Information Act. This case thus turns on the sufficiency of the government's affidavits to show that in the name of national security it is entitled to withhold the requested documents. Because these affidavits loom so large in the decision of this case, throughout this opinion we excerpt liberally from them as we consider their adequacy.

## I. HISTORY OF THE CASE

The events which provide the motivation for the requests litigated here under the Freedom of Information Act are intriguing, involving, as they reportedly do, a covert CIA operation costing more than a third of a billion dollars, the billionaire recluse Howard Hughes, a sunken Soviet submarine carrying nuclear weaponry, the theft during a highly professional burglary of documents detailing the mission, and finally, tireless CIA efforts, for a time successful, to obtain the silence of many of the nation's most prestigious news organizations. For our purposes here, the briefest of summaries of what has been reported by the press—but not officially confirmed by the government—will suffice to provide the

background necessary to an understanding of this case.

### A. Background

According to reports widely publicized in 1975,[1] a Soviet submarine carrying nuclear missiles sunk sometime in 1968 in about three miles of water somewhere northwest of Hawaii. The location of the sunken craft was unknown to the Soviets, who tried unsuccessfully to find the remains. United States Navy sensors, however, managed to pinpoint the submarine's final resting place and an American electronics ship dispatched to the spot detected, scanned and photographed the sunken vessel.

Because when it went down the submarine took with it torpedoes, nuclear missiles, codes and code machines, communications gear and perhaps other equipment of intense interest to the American military and intelligence services, the Navy approached the CIA to develop the capability necessary to raise the vessel from its underwater grave for analysis by United States experts. The CIA, in turn, went to Hughes, who arranged for the construction of a 36,000-ton floating platform, the *Hughes Glomar Explorer*, and a huge submersible barge, designated the HMB-1 (an abbreviation for *Hughes Mining Barge-1*) to accompany it. Together these two vessels were designed to raise the Russian submarine under an elaborate cover story in which the *Glomar Explorer*'s mission was said to be the recovery of manganese nodules from the ocean floor.

In June 1974 the *Glomar Explorer* and its companion barge sailed to the site of the sunken submarine and attempted to raise it by lowering giant claws to the bottom of the ocean, seizing the ship and winching it to the surface. Unfortunately, weakened by the corrosive influence of the deep and by the mishap that sent it to the bottom, the submarine broke in two about halfway to the surface. Only the forward third was

1. The following summary is based principally on the reports which appeared in *The New York Times; CIA Tried to Get Press to Hold Up Salvage Story*, N.Y. Times, 20 Mar. 1975, at C31, col. 1, *reprinted in* Joint Appendix [hereinafter J.A.] at 9, and in *Time* magazine, *The Great Submarine Snatch*, Time, 31 Mar. 1975, at 20, *reprinted in* J.A. at 11.

successfully recovered; the remainder settled once more to the ocean floor. At this point, with the operation already having cost $350 million, arrangements were made to try again to lift from the bottom what still remained there.

But at about this time a mysterious burglary took place at a Hughes office in Los Angeles. Four or five armed men overwhelmed a guard, slipped past a sophisticated electronic alarm system and burned their way into a Hughes safe containing documents outlining the participation of the Hughes organization in the effort to raise the submarine. As a result the *Los Angeles Times* somehow came into the possession of incomplete and somewhat garbled information about the *Glomar Explorer* project and, on 8 February 1975, published what it had learned.

Director William Colby and other CIA officials then scrambled to suppress the story. They met with temporary success: the *New York Times*, the *Los Angeles Times*, the *Washington Post*, the *Washington Star*, the three major television networks, the National Public Broadcasting System, *Time* magazine and *Newsweek* all agreed to "hold" the story—at least until someone else published an account of the operation—in exchange for briefings on the submarine raising efforts. But on 18 March 1975 columnist Jack Anderson decided to break the story and "the cat was out of the bag."

Or was it? Questions remain. As *Time* put it in its 31 March 1975 article:

[T]here is the puzzle of why so many reporters for major newspapers, magazines and TV networks simultaneously stumbled upon the [*Glomar Explorer* project] trail. On the morning after, some journalists got the feeling that the CIA had actually been helpful all along in getting the story out, while at the same time it apparently tried to suppress the story. There are several theories . . . . The last theory goes off into the wild blue yonder, suggesting that raising a Soviet submarine was not [the project's] mission at all, but the supreme cover for a secret mission as yet safely secure.[2]

### B. The FOIA Request and Ensuing Litigation

Three days after the *Time* story was published, on 3 April 1975, letters signed by Fritzi Cohen on behalf of the Military Audit Project were sent to the Department of Defense and to the Central Intelligence Agency requesting access under the Freedom of Information Act to "the contract and all other documents pertaining to the planning, design, construction, leasing, use and disposition of the Glomar Explorer, recently reported as used to recover the Soviet Submarine in the Pacific."[3] Invoking Exemptions 1 and 3 of the Freedom of Information Act (pertaining to classified records and documents exempted from disclosure by statute),[4] each agency was quick to reject the requests.[5] At the outset, neither agency was willing to confirm or to

2. *The Great Submarine Snatch*, Time, 31 Mar. 1975, at 20, *reprinted in* J.A. at 11.

3. Letter from Fritzi Cohen to Department of Defense, OSD Public Affairs, Directorate, Freedom of Information (3 Apr. 1975), *reprinted in* J.A. at 16. A similar letter evidently was sent to the Central Intelligence Agency on the same date.

4. 5 U.S.C. § 552(b)(1), (3) (1976). Exemption 1 exempts from the operation of the Freedom of Information Act

matters that are

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and

(B) are in fact properly classified pursuant to such Executive order;

Exemption 3 exempts matters that are specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;ı

5. Letter from Charles W. Hinkle, Director, Freedom of Information and Security Review, Office of the Assistant Secretary of Defense for Public Affairs, to Fritzi Cohen (16 Apr. 1975), *reprinted in* J.A. at 19; Letter from Robert S. Young, Freedom of Information Coordinator, Central Intelligence Agency, to Fritzi Cohen (11 Apr. 1975), *reprinted in* J.A. at 17.

deny even the existence of such records. Both agencies stated that such an admission or denial could itself compromise national security.[6]

Cohen then pursued administrative appeals, but these also were denied by both agencies.[7] In October 1975 the Military Audit Project and Cohen, now joined by Mortin Halperin, requested reconsideration of these denials.[8] These requests were in turn denied, although by this time the CIA was at least willing to admit both that the *Glomar Explorer* belonged to the United States—though not necessarily to the CIA—and that a classified United States government contract provided evidence of that ownership.[9]

 Unsatisfied, the Military Audit Project, joined by Cohen and Halperin individually, in December 1975 brought an action in the United States District Court for the District of Columbia to compel the production of

the contract, and all other documents pertaining to the financial arrangements between or among the government of the United States, any agency thereof, Hughes Tool Co., Summa Corporation and Global Marine, Inc., or any of them, in particular such documents that reflect sums paid by the government of the United States or any agency thereof to any of the other entities named above, the profits earned by any of such other entities and any provisions for disposition by the government of the United States to any of the other named entities, with respect to the vessel "Glomar Explorer." [10]

Named as defendants were William Colby, who was then Director of Central Intelligence, the Central Intelligence Agency, and the Department of Defense. The complaint alleged that the Military Audit Project was an unincorporated association and a "person" within the meaning of the Freedom of Information Act.[11]

---

**6.** In support of its Exemption 1 claims each agency relied on Executive Order No. 11,652, 3 C.F.R. § 375 (1973) (superseded by Executive Order No. 12,065, 3 C.F.R. § 190 (1979), which went into effect on 1 Dec. 1978). Executive Order No. 11,652 established the criteria then in effect for the classification of secret documents.

In support of its Exemption 3 claims each agency relied on section 102(d)(3) of the National Security Act of 1947, 50 U.S.C. § 403(d)(3) (1976). Section 102(d)(3) provides that the "Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." Pursuant to section 102(d)(3), 50 U.S.C. § 403g provides that "in order further to implement the proviso of section 403(d)(3) of this title that the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure, the Agency shall be exempted from the provisions of section 654 of Title 5, and the provisions of any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the agency . . . ."

**7.** Letter from Joseph Laitin, Assistant Secretary of Defense, Public Affairs, to Fritzi Cohen (20 May 1975), *reprinted in* J.A. at 21; Letter from John F. Blake, Chairman, Information Review Committee, Central Intelligence Agency,

to Fritzi Cohen (23 May 1975), *reprinted in* J.A. at 23.

**8.** Letter from William A. Dobrovir to Joseph Laitin and John Blake (7 Oct. 1975), *reprinted in* J.A. at 25.

**9.** Letter from John F. Blake, Chairman, Information Review Committee, Central Intelligence Agency, to William A. Dobrovir (12 Nov. 1975), *reprinted in* J.A. at 27.

**10.** Complaint, *Military Audit Project v. Colby*, No. 75–2103 (D.D.C., filed 13 Dec. 1975), *reprinted in* J.A. at 28–29.

**11.** By written submission following oral argument we have been informed that the Military Audit Project was incorporated in the District of Columbia on 13 Oct. 1976 as a nonprofit organization. Letter from Stephen Daniel Keeffe, General Counsel, Military Audit Project, to Allan Hoffman (12 Feb. 1981) (submitted at the request of this court by counsel for the Military Audit Project, 13 Feb. 1981). The purpose of the organization is stated to be "the investigation of the expenditure of taxpayers' money as it relates to the maintenance of national security." *Id.* It is managed by a thirteen member Board of Directors. Appellant Felice (Fritzi) Cohen is its Executive Director. *Id.*

Under the Freedom of Information Act, the identity of the requester is immaterial; for ex-

The defendants continued to refuse to confirm or deny even the existence of the documents requested. Instead, they moved alternatively for a dismissal or for summary judgment; in support of these motions they submitted a very short affidavit by the Deputy Under Secretary for Management of the Department of State, Lawrence Eagleburger, and requested leave to submit two further affidavits *in camera*.[12] The district court denied the defendants' request to submit materials *in camera* on the basis of the Eagleburger affidavit alone, requiring the defendants first publicly to submit "[a]n adequate, complete affidavit justifying exemption . . . reciting all pertinent facts short of those that reveal any fact which defendants believe is protected by the exemption claimed."[13]

In response the defendants filed two additional affidavits, one by the CIA's Deputy Director for Science and Technology, Carl E. Duckett, and a second by the Assistant to the President for National Security Affairs, Brent Scowcroft. The Duckett affidavit stated that:

Acknowledgment of the existence or nonexistence of the information requested could reasonably be expected to result in the compromise of important intelligence operations, significant scientific and technological developments relating to national security, and result in a disruption in foreign relations significantly affecting the national security. . . . If the CIA or DoD were responsible for the HUGHES GLOMAR EXPLORER Program, that fact itself would necessarily be classified because an official confirmation, in my judgment, would result in harm to the national security . . . .[14]

The Scowcroft affidavit went into somewhat greater detail about the project:

In a document dated October 20, 1969, classified Top Secret, Executive Branch approval was given to the establishment of a classified United States Government program to accomplish certain secret tasks in furtherance of national security objectives of the United States. A committee of the National Security Council (NSC) chaired by the Assistant to the President for National Security Affairs was assigned to supervision of the program. The program included the design, construction, operation, and use of a ship which came to be known as the HUGHES GLOMAR EXPLORER. United States Government documents produced in the course of executing the program were

ample, there is no statutory bar to the military attache of the Soviet embassy filing FOIA requests for information from the CIA and the FBI on the same basis as a United States citizen. The only important limitations on the exercise of the rights provided by the Act arise from the nine exemptions. The fact that the FOIA is a liberal disclosure statute and that the identity of the requester is immaterial does not imply, however, that a nonexistent entity concocted out of thin air by the imagination of some single person can file a lawsuit in court and have it honored in the fictitious entity's name. Furthermore, the liberal disclosure policy behind the FOIA statute in no way alters a lawyer's obligations to know something about his client because what he says to the court in his pleadings and argument often implicitly are representations about his client's position and existence. Therefore, the nature of an entity suing under the FOIA is not without relevance, and the district court ought to satisfy itself as to the existence and organizational structure of unincorporated entities suing under the Act.

12. Eagleburger's affidavit, after affirming his official position with the Department of State and his familiarity with the contents of the plaintiffs' complaint, contained only one sentence referring to the documents requested: "I am familiar with the facts and circumstances surrounding this case and can affirm that the information relevant to the United States Government case has been classified pursuant to Executive Order 11652, 3 C.F.R., Executive Order 11652 (1974 edition) on the ground that public disclosure would damage the national security, including the foreign relations of the United States." Affidavit of Lawrence S. Eagleburger, Deputy Under Secretary for Management, Department of State, *Military Audit Project v. Colby*, No. 75–2103 (D.D.C., sworn to 16 Jan. 1976), *reprinted in* J.A. at 31–32.

13. Memorandum and Order, *Military Audit Project v. Colby*, No. 75–2103 (D.D.C., filed 5 Mar. 1976).

14. Affidavit of Carl E. Duckett, Deputy Director for Science and Technology of the Central Intelligence Agency, *Military Audit Project v. Colby*, No. 75–2103 (D.D.C., sworn to 19 Mar. 1976), *reprinted in* J.A. at 166–68.

classified Top Secret or Secret pursuant to procedures and criteria of Executive Orders 10501 and 11652 based on determinations that disclosure of information concerning the program could cause exceptionally grave or serious damage to the national security . . . .

From the outset of the Program it was recognized that the revelation of the very existence of the Program and, specifically, the fact that the United States was the sponsor of the activity involving the HUGHES GLOMAR EXPLORER could provoke a foreign power to take countermeasures which would render the Program incapable of execution. Accordingly, it was decided that the United States Government should make arrangements with private corporations to provide a commercial base for the HUGHES GLOMAR EXPLORER undertaking. After several alternatives were considered, arrangements were made with the Hughes Tool Company to act as agent of the United States to sponsor the undertaking. This agreement evolved into a formal contractual relationship wherein the Hughes Tool Company and thereafter the Summa Corporation, its successor organization, undertook to carry out certain functions on behalf of the United States including holding bare record title to the HUGHES GLOMAR EXPLORER. . . .

For reasons unrelated to this case a committee of the NSC determined on 8 August 1975 that it had become necessary for the United States to acknowledge ownership of the HUGHES GLOMAR EXPLORER and to declassify certain portions of its contract with Summa Corporation and Global Marine, Inc. The NSC Committee directed that "no further facts" would be declassified and specifically directed that the fact of the involvement in the Program of any given United States Government Agency should not be disclosed. The Committee noted further " . . . a firm line would be drawn between the fact of Federal ownership and other matters relating to the Project." Those portions of documents which relate to the United States ownership and evidence the United States contractual relationship with Hughes Tool Corporation, Summa Corporation and Global Marine, Inc. have been declassified pursuant to the NSC Committee decision . . . . Official acknowledgment of the involvement of specific United States Government agencies would disclose the nature and purpose of the Program and could, in my judgment, severely damage the foreign relations and the national defense of the United States. . . .[15]

After admitting that there had been a great deal of speculation in the press concerning the nature of the mission the *Glomar Explorer* was to carry out, the Scowcroft affidavit went on to describe why official confirmation of the involvement of the particular agencies in question was undesirable:

While it is known and accepted that nations engage in secret activities, designed to promote their foreign and national defense policy interests, traditionally, and for sound practical reasons in the conduct of foreign affairs, governments do not officially acknowledge that they engage in such activities. In this context all nations are aware that they may be the objects of such operations and may even unofficially acknowledge this fact. No government, however, could tolerate the official acknowledgment by another government that such an operation has been conducted against it. When such official acknowledgment occurs, the nation that has been the object of such an operation must take some action in response. The nature of the retaliatory action taken by the offended nation will vary in proportion to the perceived offense. Depending on the nature and magnitude of the activity acknowledged, the offended nation may take strong measures . . . .

---

15. Affidavit of Brent Scowcroft, Assistant to the President for National Security Affairs, *Military Audit Project v. Colby*, No. 75–2103 (D.D.C., sworn to 19 Mar. 1976), *reprinted in* J.A. at 170–72.

Foreign countries who believe they would benefit by demeaning the United States would be able to use information about this Program to castigate the United States in an international forum. Fabrications or suggestions concerning our activities, which the United States would be unable to disprove, could be expected to develop from the disclosure of relatively limited information. The information sought in this case could be used as circumstantial evidence to substantiate false charges of United States interference in the affairs of other countries. This in turn could raise suspicions about and possibly endanger United States military and diplomatic personnel and businessmen overseas.[16]

Even after the Duckett and Scowcroft affidavits were submitted, however, the district court denied the defendants' motion for summary judgment, ordering instead an *in camera* proceeding in which the defendants would be required to produce an index of the documents covered by the request as well as the documents themselves, if any, and a document-by-document explanation of the harm to the national security release of the documents would entail. In addition, the defendants were ordered to produce witnesses capable of substantiating on their personal knowledge under oath on a transcript to be sealed the national security claims made in opposition to release.[17]

The defendants then requested relief from the order that they produce documents and an index *in camera*; to comply, they claimed, would imply that they actually possessed such documents. In support of a renewed motion to dismiss, the defendants submitted yet another affidavit, this time by Director of Central Intelligence George Bush.[18] The Bush affidavit focused on the dangers of releasing information regarding the budget of the CIA:

It has been publicly disclosed that the annual CIA appropriation is contained in the annual appropriations to the Department of Defense, and that the funds involved are made available to the CIA under the transfer-of-appropriation provisions of the CIA Act of 1949. The annual CIA budget, however, is not now and never has been a matter of public knowledge. Neither have the details of that budget ever been matters of public knowledge. The non-disclosure of this information has a long record of approval by the Congress. For example, the CIA budget presentations have always been heard by the appropriate congressional committees in executive session. The resulting appropriations are not identified as such in any public document. Both the Senate and the House of Representatives have recently rejected, by substantial margins, legislation that would have required, in one case, the publication of the aggregate budget for the Intelligence Community and, in the other case, publication of the CIA budget. . . .

[A] demand for documents reflecting specific CIA expenditures, which is the nature of the demand stated in the complaint in this case, is even more difficult to accommodate, consistently with the need to protect intelligence activities and operations against disclosure, than a demand for the annual CIA budget figure. The nature and purpose of the intelligence projects or activities being funded could be deduced from knowledge of specific CIA expenditures. Moreover, if the disclosure of specific CIA expenditures could be compelled, a picture of the annual CIA budget would soon emerge.

\* \* \* \* \* \*

[W]ithout admitting or denying the possession or custody of any documents of the kind described in the complaint in this case, it is obvious that, if CIA holds any

---

16. *Id.* at 172–73.

17. Memorandum and Order, *Military Audit Project v. Colby*, No. 75–2103 (D.D.C., filed 10 May 1976).

18. Affidavit of George Bush, Director of Central Intelligence, *Military Audit Project v. Bush*, No. 75–2103 (D.D.C., sworn to 15 June 1976), *reprinted in* J.A. at 174–78.

such documents, they would reflect specific CIA expenditures, and it is my judgment that disclosure of any such documents would expose intelligence activities of a confidential nature .... [19]

On 30 June 1976 the district court once again denied the defendants' motion and set a date for an *in camera* proceeding. The district court refused to certify the question for an interlocutory appeal, and the defendants then brought to this court a petition for a writ of mandamus or prohibition, as well as an attempted appeal from the district court's ruling requiring an *in camera* proceeding. On 1 October 1976 in two *per curiam* orders this court denied the petition and dismissed the appeal.[20]

Upon remand to the district court, the defendants submitted *in camera* eight classified affidavits and presented the classified testimony of several unidentified witnesses. After hearing the *in camera* testimony and examining the classified affidavits, the district court on 20 October 1976 entered an order which states only that: "the complaint is dismissed for reasons stated *in camera*." [21]

The case then came before this court for the second time, on an appeal by the plaintiffs from the decision of the district court. The plaintiff-appellants began by moving for "copies of affidavits filed ex parte by defendants-appellees and of a copy of a memorandum filed *in camera* by the district court." We denied this motion in a *per curiam* order with an accompanying memorandum issued on 14 January 1977.[22] The reason for this denial was our judgment that to compel service of the affidavits filed *ex parte* would be tantamount to granting the final relief sought by the appellants.

This court did find, however, that the appellants deserved a more specific expla-

nation for the action of the district court upon which to base their appeal, because "the asserted exemptions for information concerning the identity of the agencies and the asserted exemptions for the contents of the requested documents total eight separate justifications, any one of which the District Court could have relied upon when dismissing the complaint." [23] As a result the appellants could not know the basis for the decision of the district court, leaving them in a position from which it would be difficult intelligently to argue an appeal. Concluding that "the District Court in this case should have endeavored to prepare a more informative opinion to be released to appellants and to the public; it should not have simply referred to 'reasons stated *in camera*,' " [24] we disclosed that the holding of the district court: "in effect states [1] that the identity of the specific agencies involved is exempt under 5 U.S.C. § 552(b)(1) and [2] that, whichever agencies were involved, the contents of the requested documents are exempt under the same section." [25]

The appellants, now armed with an understanding of the reasons for the district court's ruling, were given forty days from the entry of our order in which to submit their briefs on appeal.

Then, on 8 June 1977, the defendants suddenly changed their position and moved to remand the action to the district court on the grounds that:

It has now been determined that the fact that the Central Intelligence Agency, one of the defendants in this case, was involved in the Hughes Glomar Explorer Program may be made public. The District Court should have an opportunity to consider in the first instance what im-

---

**19.** *Id.* at 176–78.

**20.** In re *Bush*, No. 76–1615 (D.C.Cir., filed 1 Oct. 1976); *Military Audit Project v. Bush*, No. 76–1624 (D.C.Cir., filed 1 Oct. 1976).

**21.** Order, *Military Audit Project v. Bush*, No. 75–2103 (D.D.C., filed 20 Oct. 1976).

**22.** Memorandum and Order, *Military Audit Project v. Bush*, No. 76–2037 (D.C.Cir., filed 14 Jan. 1977), *reprinted in* J.A. at 182–88.

**23.** *Id.* at 3, *reprinted in* J.A. at 185.

**24.** *Id.* at 4, *reprinted in* J.A. at 186.

**25.** *Id.* at 5, *reprinted in* J.A. at 187.

pact, if any, this fact has on the litigation.[26]

This change in the government's position apparently resulted from a shift in the perception of national security interests that occurred when the Carter administration took office.[27] Accordingly, this court ordered that the district court's dismissal of the complaint be vacated and remanded the case "for further proceedings pursuant to *Vaughn v. Rosen*, 523 F.2d 1136 (1975)."[28] On remand when it became clear that the defendants intended to continue to resist disclosure of some of the requested documents, the district court judge disqualified himself from further proceedings in the case in view of his previous rulings in favor of the defendants' now-abandoned position.

The defendants then released about *two thousand pages* of materials within the scope of the plaintiffs' requests, although continuing to refuse to release certain information they considered still to be covered by Exemptions 1 and 3 of the Freedom of Information Act. At the same time the defendants filed an affidavit of a Contracting Officer in the Central Intelligence Agency's Directorate of Science and Technology, William S. Regan, in which the documents—both those released and those withheld—were described.[29]

26. Appellees' Motion to Remand, *Military Audit Project v. Bush*, No. 76–2037 (D.C.Cir. 8 June 1977).

27. In a letter to the district court, Assistant Attorney General Babcock of the Carter administration explained:

[I]n light of the passage of time, changing circumstances and the fact that a new Administration had taken office in the interim, the Chief of the Civil Division's Information and Privacy Section, early in 1977, requested the CIA to ascertain the views of the new Assistant to the President for National Security Affairs concerning the issue as to whether the fact of CIA's past involvement in the Glomar Explorer program still required protection from disclosure on national security grounds.

After considering the matter, appropriate Executive Branch officials charged with responsibility for advising the President on national security matters determined that the disclosure at this time that the CIA had been involved in the Glomar program would not, in their judgment, damage the national security. That determination, of course, undercut the position previously asserted by the government that the fact of CIA involvement in the Glomar program could not be publicly disclosed.

Letter from Barbara Allen Babcock, Assistant Attorney General, to the Honorable Gerhard A. Gesell (15 July 1977), *reprinted in* J.A. at 190–91.

28. Order, *Military Audit Project v. Bush*, No. 76–2037 (D.C.Cir., filed 16 June 1977), *reprinted in* J.A. at 189.

29. Affidavit of William S. Regan, *Military Audit Project v. Turner*, No. 75–2103 (D.D.C., sworn to 28 Sept. 1977), *reprinted in* J.A. at 192–200 [hereinafter cited as Regan Affidavit]. The Regan Affidavit revealed that, in addition to the documents requested by the plaintiffs, the CIA had in its possession about 128,000 documents logged in accordance with the document security control systems established for the *Glomar Explorer* project. *Id.* at 6, *reprinted in* J.A. at 197. The affidavit also disclosed that the contractual documents created prior to February 1975 did not bear classification markings on their face because:

As part of the extraordinary security procedures established for this Project, and in order to protect the commercial cover of the undertaking, an affirmative decision was made by a senior CIA official with classification authority who was responsible for establishing security for the HGE Project that normal classification markings would not be affixed to documents held by industrial contractors. Classification markings were not affixed to such documents because such markings would instantly reveal to any casual observer that these documents were, in fact, United States Government documents; and such disclosure would, of course, compromise the commercial cover nature of the arrangement. Nevertheless all documents, in the possession of the contractors, were controlled by contractor personnel who had requisite security clearances and who had been trained in established United States Government procedures for handling and storage of classified material.

*Id.* at 8–9, *reprinted in* J.A. at 199–200.

In addition to the Regan Affidavit, the defendants also filed an affidavit prepared by Deputy Assistant Secretary of Defense David O. Cooke, indicating that the Department of Defense had in its possession only one document fitting the description of the documents requested, and that that document was a duplicate of a CIA document listed in the Regan Affidavit. Affidavit of David O. Cooke, *Military Audit Project v. Turner*, No. 75–2103 (D.D.C., sworn to 27 Jan. 1978), *reprinted in* J.A. at 214–15 [hereinafter cited as Cooke Affidavit].

In March 1978 the defendants filed with the district court four affidavits justifying the continued exemption and deletion of the remaining material withheld. These were affidavits by Secretary of State Cyrus Vance,[30] Director of Central Intelligence Stansfield Turner,[31] the Director of Finance of the Central Intelligence Agency, Thomas B. Yale,[32] and the Associate Deputy Director of the Directorate of Science and Technology of the Central Intelligence Agency, Ernest J. Zellmer.[33] A month later, the Zellmer Affidavit was supplemented with a second affidavit in which the deleted information was divided into thirteen categories.[34]

After these affidavits were filed, however, the President promulgated an executive order [35] establishing new standards for the classification of government information. The defendants then reviewed the documents withheld to determine whether the withheld information was properly classified under the criteria of the new executive order. The defendants concluded that it was, and Zellmer submitted a third affidavit describing the reasons for the defendants' conclusions.[36]

It is the sufficiency of these eight affidavits, the Regan Affidavit, the Cooke Affidavit, the Vance Affidavit, the Turner Affidavit, the Yale Affidavit, and the three Zellmer Affidavits, which is the principal subject of this appeal. For on the basis of these affidavits the defendants moved for summary judgment under FOIA Exemptions 1 and 3. In response, the plaintiffs noticed the depositions of Vance, Turner, Yale and Zellmer, but the district court granted a motion by the defendants for a protective order barring any further discovery by the plaintiffs.[37] After briefing and argument, the district court then granted summary judgment for the defendants.[38] After unsuccessfully moving for reconsideration, the plaintiffs brought this appeal.

## II. THE APPLICABLE LEGAL STANDARD

The operation of the Freedom of Information Act when classified documents are requested is by now familiar and well-established. This case thus does not require us to make new law but rather merely to apply the old.

■ We begin with Exemption 1,[39] which protects from disclosure under the Act

**30.** Affidavit of Cyrus R. Vance, *Military Audit Project v. CIA*, No. 75–2103 (D.D.C., sworn to 2 Feb. 1978), *reprinted in* J.A. at 217–19 [hereinafter cited as Vance Affidavit].

**31.** Affidavit of Stansfield Turner, *Military Audit Project v. Turner*, No. 75–2103 (D.D.C., sworn to 3 Mar. 1978), *reprinted in* J.A. at 229–36 [hereinafter cited as Turner Affidavit].

**32.** Affidavit of Thomas B. Yale, *Military Audit Project v. Turner*, No. 75–2103 (D.D.C., sworn to 4 Mar. 1978), *reprinted in* J.A. at 237–43 [hereinafter cited as Yale Affidavit].

**33.** Affidavit of Ernest J. Zellmer, *Military Audit Project v. Turner*, No. 75–2103 (D.D.C., sworn to 23 Feb. 1978), *reprinted in* J.A. at 220–28 [hereinafter cited as First Zellmer Affidavit].

**34.** Supplemental Affidavit of Ernest J. Zellmer, *Military Audit Project v. Turner*, No. 75–2103 (D.D.C., sworn to 4 Apr. 1978), *reprinted in* J.A. at 244–47 [hereinafter cited as Second Zellmer Affidavit].

**35.** Executive Order No. 12,065, 43 Fed.Reg. 28949, 3 C.F.R. § 190 (1979) (promulgated 3 July 1978 to go into effect 1 Dec. 1978), *su-*

*perseding* Executive Order No. 11,652, 3 C.F.R. § 375 (1973).

**36.** Third Affidavit of Ernest J. Zellmer, *Military Audit Project v. Turner*, No. 75–2103 (D.D.C., sworn to 4 Apr. 1979), *reprinted in* J.A. at 252–58 [hereinafter cited as Third Zellmer Affidavit].

**37.** Order, *Military Audit Project v. Turner*, No. 75–2103 (D.D.C., filed 16 May 1979), *reprinted in* J.A. at 266.

**38.** Opinion and Order, *Military Audit Project v. Colby*, No. 75–2103 (D.D.C., filed 4 Oct. 1979), *reprinted in* J.A. at 267–70.

**39.** Throughout this opinion we address the competing claims of the appellants and the government regarding Exemption 1 of the Freedom of Information Act, which protects classified information from disclosure. Much of the information at issue here, however, might also be exempt from disclosure under Exemption 3 which shields "matters" that are:

specifically exempted from disclosure by statute (other than section 552b of this title),

"matters" "specifically authorized under criteria established by an Executive order to be kept secret in the interest of the national defense or foreign policy" which "are in fact properly classified pursuant to such an Executive order."[40] Exemption 1 in this way establishes a specific exemption for defense and foreign policy secrets, and delegates to the President the power to establish the scope of that exemption by executive order.

The pertinent executive order now in force is Executive Order No. 12,065.[41] That order directs that the designation "Secret" shall apply only to "information, the unau-

thorized disclosure of which reasonably could be expected to cause serious damage to the national security."[42] The order further directs that information may not be classified unless it concerns certain enumerated matters, including "intelligence activities, sources or methods" and "foreign relations or foreign activities of the United States."[43]

The defendants assert that the information they have withheld from the appellants concerns such matters and has properly been classified "Secret."[44] The appellants do not contend that the documents they seek do not concern the "intelligence activi-

---

provided such statute (A) requires that the matters be withheld from the public in such manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3) (1976). Such a statute is 50 U.S.C. §§ 403(d)(3), 403g. Section 403(d)(3) provides that "the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure," while section 403g adds that:

In the interests of the security of the foreign intelligence activities of the United States and in order further to implement the proviso of section 403(d)(3) of this title that the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure, the Agency shall be exempted from . . . the provisions of any other law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or number of personnel employed by the Agency . . . .

50 U.S.C. § 403g (1976). The Freedom of Information Act being an "other law" within the meaning of § 403g, the CIA is plainly exempt from *all* the provisions of the FOIA as regards the classes of information described in that statute. We held in *Phillippi v. CIA,* 546 F.2d 1009, 1015–16 n.14 (D.C.Cir.1976), that section 403g is not broad enough to cover the withholding by the agency of any information whatever, but exempts the agency only from any other statute "that would otherwise require the Agency to divulge information *about its internal structure." Id.* (emphasis added).

To summarize: (1) with regard to information about its "internal structure," the CIA is exempt from all the provisions of the FOIA; (2) with regard to information that might reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods, the CIA is entitled to the protection of Exemption 3 of the FOIA, but is otherwise subject to the

requirements of the FOIA; and (3) with regard to properly classified documents the CIA is entitled to the protection of Exemption 1 of the FOIA, but is otherwise subject to the requirements of that statute.

All of the documents the CIA seeks to withhold in the case before us are classified; if properly classified, they then come within the scope of Exemption 1. Some of the categories of information withheld are not only classified, but also include information which could reasonably be expected to lead to the disclosure of intelligence sources and methods. In these cases Exemption 3 also applies and provides overlapping protection. In what follows, noting with the *Phillippi* court that "inquiries into the applicability of the two exemptions may tend to merge," *Id.,* we will not distinguish further between Exemption 1 and Exemption 3, but will focus instead solely on Exemption 1.

**40.** 5 U.S.C. § 552(b)(1) (1976).

**41.** 3 C.F.R. § 190 (1979). Executive Order No. 12,065 went into effect on 1 December 1978, superseding Executive Order No. 11,652, 3 C.F.R. § 375 (1973). At the time of the initial FOIA request in this case the documents at issue were classified under Executive Order No. 11,652. Since that time, however, the classification of these documents has been reevaluated under Executive Order No. 12,065. *See* Third Zellmer Affidavit. Therefore Executive Order No. 12,065 controls this litigation. *Lesar v. United States Dep't of Justice,* 636 F.2d 472, 479–81 (D.C.Cir.1980).

**42.** Exec. Order No. 12,065, 3 C.F.R. § 190, sec. 1–103 (1976).

**43.** *Id.* at sec. 1–301(c)–(d).

**44.** *See* Part III *infra.*

ties, sources or methods"[45] of the United States. The sole issue before us, then, is whether release of the requested documents "reasonably could be expected to cause serious damage to the national security."

As in any FOIA case, we are required to "determine the matter de novo, and . . . the burden is on the agency to sustain its action."[46] But the legislative history of the 1974 amendments to the Act nonetheless makes it clear that we "must recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosures of a particular classified record."[47] We are therefore required to "accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record."[48]

■ Furthermore, it is now well established that summary judgment on the basis of such agency affidavits is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.[49]

Our task here is simply to review the decision of the trial court to satisfy ourselves that it is in accordance with these well-known standards.

## III. THE SUFFICIENCY OF THE AFFIDAVITS FOR SUMMARY JUDGMENT

At issue in this case is whether the government's affidavits are sufficient to entitle it to summary judgment. Nine separate categories of information have been withheld; each category of nondisclosed information is separately contested on the basis of the government's affidavits and the appellants' responses. We therefore individually consider each category of information in turn. In so doing, we excerpt liberally from the affidavits whose sufficiency is questioned, for the convenience of those who, in requesting or responding to requests for information under the Act, may be guided by our decision. We address the categories in question in the order in which they were discussed in the briefs of the parties, not necessarily in the order of their importance.

### A. *Names, Initials, Pseudonyms, and Official Titles of CIA Personnel Not Publicly Known as Such*[50]

The appellants do not contest the defendants' refusal to release the identities of CIA employees whose connection with the CIA has not been publicly disclosed.[51] The appellants complain, however, that "it is not clear from defendants' submissions that the CIA affiliation of all personnel whose iden-

---

**45.** Exec. Order No. 12,065, 3 C.F.R. § 190, sec. 1–103 (1976).

**46.** 5 U.S.C. § 552(a)(4)(B) (1976).

**47.** S.Rep.No. 93–1200, 93d Cong., 2d Sess. 12 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 6267, 6290. In overriding President Ford's veto of the 1974 amendments to the FOIA, the legislature made it clear that it expected the judiciary to use its de novo review powers responsibly. In Senator Muskie's words: "I cannot imagine that any Federal judge would throw open the gates of the Nation's classified secrets, or that they would substitute their judgment for that of an agency head without carefully weighing all the evidence in the arguments presented by both sides." 120 Cong.Rec. 36870 (1974) (Sen. Muskie).

**48.** S.Rep.No. 93–1200, 93d Cong., 2d Sess. 12 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 6290 (emphasis added).

**49.** *See, e. g., Baez v. United States Dep't of Justice*, 647 F.2d 1328 at 1335 (D.C.Cir. 25 Aug. 1980); *Lesar v. United States Dep't of Justice*, 636 F.2d 472, 481 (D.C.Cir.1980); *Hayden v. National Security Agency/Central Security Serv.*, 608 F.2d 1381, 1386–87 (D.C.Cir.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *Ray v. Turner*, 587 F.2d 1187, 1194–95 (D.C.Cir.1978); *Weissman v. CIA*, 565 F.2d 692, 696–98 (D.C.Cir.1977).

**50.** This category of information was given the letter "A" in the Second Zellmer Affidavit.

**51.** Brief for Appellants at 31.

tities are being withheld has not heretofore been made public."[52]

In response, the government has reaffirmed to us the assertion of the First Zellmer Affidavit that "[t]he names of CIA employees were deleted since the Agency does not disclose the identity and affiliation of those employees who do not come into public view in the course of their duties."[53] The government accordingly informs us that none of the names deleted were the names of CIA employees who have come into the public view in the course of their duties.[54] Thus this category of information is no longer at issue on appeal, because no such information has in fact been withheld.

. B. *Identities of Corporations Other than Hughes Tool Company, Summa Corporation and Global Marine, Inc.*[55]

█ The government's reasons for its deletions in this category were set forth in the First Zellmer Affidavit:

The collection of foreign intelligence is increasingly dependent on sophisticated technology and the development of technological systems. The success of a technological intelligence collection device is in turn dependent on the extent of the secrecy that surrounds its characteristics and its deployment. In most cases, the technological research, development and production is the function of private industry in the United States.... While it has been determined that the participation in this Project by Summa Corporation, Hughes Tool Company and Global Marine, Inc. need no longer be concealed for reasons of national security, it is, in my judgment, still essential that the involvement of other corporations and entities and their employees not be disclosed.... If the CIA was [sic] precluded from entering or honoring confidential agreements for the production of covert nondomestic uses of technological intelli-

gence gathering devices an extremely valuable means of gathering intelligence would be lost. The disclosure of the names of organizations and their employees who entered into such confidential agreements with the CIA, in connection with the HGE Project, would almost certainly impact negatively on the ability of the CIA to obtain the assistance of such entities and individuals in similar ventures in the future. Disclosure of these names would thrust the identified parties into public attention and would almost certainly cause them possible financial loss because many of the entities involved conduct business abroad. A disclosure that these entities had been engaged with the CIA in an intelligence operation could be harmful to their foreign business and possibly affect the safety of those of their employees who travel abroad.[56]

These allegations are inherently plausible; the difficulties an American concern doing business in some localities abroad could face once branded as a CIA "collaborator" are plain.

Nonetheless, the appellants contend that because the CIA has revealed the identities of *some* of the corporations involved in the *Glomar Explorer* project, it must reveal the identities of *all*. In particular, the appellants point to the government's disclosure of its involvement in the *Glomar Explorer* project with Hughes Tool Co., Summa Corp., and Global Marine, Inc., as well as the additional revelations apparently made by R. Curtis Crooke, a vice-president of Global Marine, Inc., while being deposed in a Los Angeles tax case that arose when Los Angeles attempted to tax the *Glomar Explorer*. In response to questions to which the government's tax counsel interposed no objections, Mr. Crooke identified Mechanics Research, Inc., Minneapolis-Honeywell, General Motors, Western Deer, Nordberg

---

**52.** *Id.*

**53.** First Zellmer Affidavit at 2, *reprinted in* J.A. at 221.

**54.** Brief for Appellees at 38.

**55.** This category of information was given the letter "D" in the Second Zellmer Affidavit.

**56.** First Zellmer Affidavit at 4–6, *reprinted in* J.A. at 223–25.

Engines, General Electric, Cooper-Bessemer, Fag Bearings (Germany), Sun Shipbuilding and Dry Dock Co., and Lockheed Corp. as having been contractors on the *Glomar Explorer* project.[57] The appellants argue that these revelations are tantamount to an admission by the government that the national security does not require that the identity of the firms with which the CIA does business be kept secret.[58]

In further support of this argument the appellants suggest that these intended and perhaps unintended disclosures provide us with an opportunity to test the proposition that adverse consequences of the kind alleged in the First Zellmer Affidavit occur as a result of the release of the identities of participants in CIA projects. The appellants imply that the government's failure to allege that any concrete adverse consequences resulted from the disclosure of the participation of the companies just mentioned strongly suggests that there was no such harm. In their view: "If exposure of the prime contractors' participation in this CIA project did not have these adverse effects, it is impossible to conclude on the basis of the hypotheticals in defendants' submissions that revelation at this late date of the identities of other contractors could reasonably be expected to have such effects."

We find appellants' argument unpersuasive. The contractors on the *Glomar Explorer* project were given assurances of secrecy[59] and it is simply a matter of common sense that companies—particularly companies doing business abroad—would desire that their connections with the CIA be kept secret, if only to protect the personal security of their employees. If the CIA cannot be counted upon to keep the identity of its contractors secret when it has given assurances it will do so, potential contractors may either demand higher fees or refuse to do business with the CIA altogether. The fact that under the press of circumstances the CIA was forced to reveal its relationship with Hughes Tool Co., Summa Corp., and Global Marine, Inc., does not contradict this conclusion. It is worth noting that when the National Security Council declassified the fact that these companies had participated in the project it also determined that "no further facts" would be declassified.[60] Moreover, the Council's conclusion has since been reinforced by more recent determinations that this information cannot be disclosed without compromising national security.[61]

If the CIA could guarantee perfect security to its secret contractors it might well be able to entice more companies into doing business with it. Unfortunately, a contractor must consider the possibility that leaks may occur. But it is one thing for a company to assume the risks of unavoidable or inadvertent leaks and quite another to assume the risk that a stray Freedom of Information Act request will cause the CIA to reveal the link between the company and the Agency. The latter is a risk that need not be borne, and for the reasons set forth in the First Zellmer Affidavit, should not be borne.

■ We therefore must reject the appellants' suggestion that in order to establish that Exemption 1 protects the identity of CIA contractors whose connections with the Agency are still secret, the CIA must allege that specific harms have materialized as a result of earlier revelations. First, it is apparent that the extent to which the personnel employed by these companies have

---

57. Brief for Appellants at 33–35.

58. *Id.* at 35.

59. The contract between the United States government, "the Sponsor," and Hughes Tool, the "Agent," for example, provided that: "Sponsor further agrees to utilize its best efforts to prevent any publicity from this program and its mission redounding against Agent." Reply Brief of Appellants at 14.

60. Affidavit of Brent Scowcroft, Assistant to the President for National Security Affairs, at 3, *Military Audit Project v. Colby*, No. 75–2103 (D.D.C., sworn to 19 Mar. 1976), *reprinted in* J.A. at 171.

61. *See* First Zellmer Affidavit at 4–6, *reprinted in* J.A. at 223–25; Third Zellmer Affidavit at 4–5, *reprinted in* J.A. at 255–56.

been subjected to augmented hazards abroad specifically because of past revelations would be hard to prove in a court of law no matter how real the dangers may be. But more importantly, the extent of *actual* injury flowing from the prior revelations by the CIA in *this* case is not critical to an evaluation of the plausibility of the allegations of the First Zellmer Affidavit. The key assertion of the First Zellmer Affidavit is that revelation of the identity of the CIA's secret contractors would "impact negatively on the ability of the CIA to obtain the assistance of such entities and individuals in similar ventures in the future." [62]

This assertion is based on the entirely plausible proposition that secret CIA contractors seek to avoid assuming the risk that their connection with the Agency will be disclosed. That the threatened harm failed to materialize after any one particular disclosure does not prove that the risk is insignificant, and will not be likely to allay the insecurity felt by potential contractors. Thus, even if the appellants were somehow able to show that Hughes Tool Co., Summa Corp., and Global Marine, Inc., suffered *no adverse consequences whatever* from the disclosure of their participation in the *Glomar Explorer* project, that showing would not contradict the allegations of the First Zellmer Affidavit. The allegations of the First Zellmer Affidavit would be contradicted only by a showing that potential secret CIA contractors would not be dissuaded from participation in future CIA projects if they knew their identity would be revealed should it be the target of a Freedom of Information Act request.

The First Zellmer Affidavit claims to the contrary and is entitled to substantial weight.[63] In making this judgment the CIA is operating within the area of its expertise regarding the concerns of potential sources of technological and scientific

assistance. Its assertions in the First Zellmer Affidavit are contradicted nowhere in the record. We affirm the district court's conclusion that summary judgment should be granted the defendants regarding this category of information.

### C. *Information or Technology Which Would Reveal the Purpose of the* Glomar Explorer *Project* [64]

■ In the Second Zellmer Affidavit the defendants indicate that they rely on the Vance Affidavit to establish their right to withhold information in this category.[65] In its most pertinent part the Vance Affidavit stated that:

> To the best of my knowledge the United States Government has acknowledged only that the GLOMAR EXPLORER was owned by the United States, that it was on a mission related to the national security and, more recently, that the Central Intelligence Agency was involved in the program. I am aware of the numerous press reports concerning the purpose of the program and the identity of other governments that may have been involved. I nonetheless believe that any confirmation or denial of these reports, or the public disclosure by the United States Government of the purpose of the program . . . could reasonably be expected to cause serious damage to the national security of the United States.

> In international affairs, one deals with intangibles and uncertainties. No one can predict with certainty what damage would flow from public disclosure of further official information about the GLOMAR program, but it is my judgment, shared by other senior officials in the Department, that such disclosures could reasonably be expected to cause serious damage to our national security.

---

**62.** First Zellmer Affidavit at 6, *reprinted in* J.A. at 224–25.

**63.** *E. g., Hayden v. National Security Agency/Central Security Serv.*, 608 F.2d 1381, 1388 (D.C.Cir.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

**64.** This category of information was designated by the letter "F" in the Second Zellmer Affidavit.

**65.** Second Zellmer Affidavit at 3, *reprinted in* J.A. at 246.

Even to speculate publicly about specific consequences that might flow from such disclosures would, in all likelihood, be damaging, as other governments might feel constrained to react to such speculation by comments or measures.[66]

The appellants argue, however, that the precise purpose of the *Glomar Explorer* project has already been revealed by both official and unofficial disclosures. They claim that: "the fact that the purpose of the Glomar Explorer program was to raise a sunken Russian submarine from the floor of the Pacific is so notorious that the defendants' rationale for withholding information which would reveal that fact cannot be given conclusive weight." [67] To buttress their claim the appellants refer to three official or semiofficial publications. First, they refer to a publication of the Senate Committee on Interior and Insular Affairs concerning the prospects for mining the ocean floor for minerals.[68] The publication contains the following summary concerning the *Glomar Explorer:*

In view of recent events, a U.S. firm that bears special mention with regard to the development of deep sea mining technology is the Summa Corporation owned by the billionaire recluse Howard Hughes. In 1968, a Russian diesel-powered submarine carrying torpedos and missiles armed with nuclear warheads sank about 750 miles northwest of Hawaii. The ship broke up as it sank to the ocean floor at a depth of 16,000 feet. Evidently, the Russian navy did not know the exact location of the mishap although U.S. listening devices had pinpointed the ship's location with accuracy. The U.S. Navy and Central Intelligence Agency (CIA) recognized this as a rare opportunity to gain valuable information about

Soviet codes and nuclear capabilities. However, the means of retrieving the remains of the submarine were lacking. The CIA apparently provided the incentive for Howard Hughes to build the 618-foot, 36,000-ton *Glomar Explorer,* which was widely advertised as a deep seabed mining ship, with the recovery of the submarine in mind. In any event, deep seabed mining made a good cover for the secret activities of the CIA to recover the submarine. Consequently, the CIA became the owner and primary impetus for the development of the specialized deep sea recovery technology through Summa Corporation, beginning about 1970.[69]

Second, the appellants point to a National Science Foundation "Memorandum to Science Writers and Editors" dated 24 November 1976 and signed by Ralph Kazarian, the Deputy Head of the Public Information Branch of the National Science Foundation. The Memorandum refers to a National Science Foundation study of the feasibility of "converting and operating the ship Glomar Explorer for deep sea scientific research." [70] The *Glomar Explorer* is referred to in the following words:

The 610-foot Explorer, built with U.S. Government funds, was unsuccessfully offered for lease in early 1976. The uncertainty of its final disposition and the decision to place it in mothballs has made recent news. Public attention was first drawn to the ship in 1974 when it was used in an attempt to lift a submarine from the floor of the Pacific Ocean.[71]

Third, and finally, the appellants point to the French edition of a book written by former CIA director William Colby describing his career with the CIA. Colby served as Director of Central Intelligence at the

---

**66.** Vance Affidavit at 2–3, *reprinted in J.A. at* 218–19.

**67.** Brief for Appellants at 37.

**68.** Congressional Research Service, Ocean Manganese Nodules, Committee on Interior and Insular Affairs, United States Senate, 94th Cong., 2d Sess. (2d ed. 1976), *reprinted in part in* J.A. at 33.

**69.** *Id.* at 32 *(footnotes omitted), reprinted in* J.A. at 34.

**70.** Memorandum to Science Writers and Editors from Ralph Kazarian, Deputy Head, Public Information Branch, National Science Foundation (24 Nov. 1976), *reprinted in* J.A. at 181.

**71.** *Id.*

time of the *Glomar Explorer*'s mission and was formerly a defendant in this suit. In the French edition of his book Colby wrote:

A deep-sea exploratory submarine, built under cover of Howard Hughes's Summa Corporation, the Glomar, had been taken on sea trials in the spring of 1974. Represented to the world as a daring experiment by Howard Hughes in the possibility of mining manganese nodules from the depths of the ocean, it started sailing in the summer. In fact, its mission was to recover a Soviet submarine stranded some 16,500 feet deep at the bottom of the Pacific. The security of the project and its cover were a dazzling success. So much so that a Soviet ship, which had come to the area on a reconnaissance mission at the very moment when the Glomar was attempting to bring up the submarine, sailed away after a few days without its crew having noticed anything suspicious. But the refloating itself was less satisfactory. At a depth of 10,000 feet, the Glomar underwent some damage. The Soviet submarine itself was broken into two pieces and only the forepart—about one-third of the ship—was eventually brought back to the surface, while the aft fell to the bottom of the sea with its nuclear missiles, its guiding apparatus, its transmission equipment, its codes, in other words with all the things the CIA had hoped to recover through this unprecedented operation.[72]

Taken together with the unofficial revelations in the press, the appellants suggest that these three rather detailed revelations, two unquestionably from government sources and one from a now-retired but formerly highly-placed official, are "tantamount to an official acknowledgement that the stories were substantially accurate."[73]

As for the technology used in the *Glomar Explorer* project, the appellants point to a descriptive brochure prepared by the General Services Administration in 1976 entitled "the Hughes Glomar Explorer—Deep Ocean Working Vessel—Technical Description and Specification."[74] That document reveals in some considerable detail the capabilities of the *Glomar Explorer*, in particular that it can lift an object weighing up to 8.5 million pounds from a depth of up to 17-thousand feet at a rate of at least six feet per minute while dynamically maintaining its position within forty feet of a point fixed on the ocean floor. In the view of the appellants, "this incredibly detailed document belies the notion that further revelations of the Glomar Explorer's technology would disclose anything about the purpose of its mission which cannot be deduced from information released by the government years ago."[75]

In sum, the appellants argue that the government already has disclosed the purpose of the *Glomar Explorer* project, as well as the technology with which it was carried out. With nothing left to hide, the government is no longer entitled to refuse to provide the appellants with the documents they have requested concerning the technology and purpose of the *Glomar Explorer* project.

The government responds by claiming that in fact the government has *not* officially confirmed the purpose of the *Glomar Explorer* project. First, the government dismisses the Senate Committee report on Ocean Manganese Nodules and the National Science Foundation brochure as being on a par with other unofficial press reports concerning the *Glomar Explorer* project: the government characterizes the Senate report as "nothing more than a compilation of speculation from non-governmental sources,"[76] and the National Science Foundation brochure as a "passing reference in a memorandum from an agency not connected in any way with the Glomar Explorer project, and which apparently was based on

---

72. W. Colby, 30 Ans de Cia 331–35 (Uncontroverted translation submitted by appellants), *reprinted in* J.A. at 206–10.

73. Brief for Appellants at 40.

74. *Reprinted in part in* J.A. at 38.

75. Brief for Appellants at 45.

76. Brief for Appellees at 42.

reports in the news media." [77] Second, the statements in the French edition of Colby's book are described by the government as "not an official governmental pronouncement" [78] because Colby was not an agency official at the time the book was published. In addition, the government informs us that the CIA did not clear the French version before its publication in France.[79] Finally, with regard to the General Services Administration brochure about the *Glomar Explorer,* the government notes that "the brochure simply describes the equipment presently installed on the Explorer; it does not necessarily reveal what technological equipment is discussed in the documents released [with deletions] to plaintiffs or what was on the ship when it was performing its sensitive, intelligence-gathering mission." [80]

The government's argument, then, is that there have in fact been no *authoritative, official* disclosures of the purpose and technology of the *Glomar Explorer* project, whatever speculation there may have been in the news media and in the publications of government agencies not responsible for the project. In effect, the government argues it still has something to hide; the *reported* purpose of the *Glomar Explorer*'s mission may well be notorious, but, the government implicitly suggests, its *actual* purpose may well still be a secret, or, at the very least, unresolved doubt may still remain in the minds of the United States' potential and actual adversaries as to the true purpose of the mission.

What, then, are we to make of the government's claims and the appellants' response? Certainly, based on information publicly available from official sources, it seems undeniable that the *Glomar Explorer* project did involve the use of a specially designed vessel capable of precisely positioning itself over a given location and then deploying an underwater work platform from which a 17-thousand-foot tapered pipe string could be lowered to the ocean floor.

We do not know what *other* abilities it may have had.

At different times two explanations have been provided for the development of this vessel. At first, the world was led to believe that the ship was designed to mine the seabed for manganese nodules. Later, the story changed and the world was led to believe that the purpose of the vessel was to raise a sunken Soviet submarine. Apparently, a vessel with the capabilities of the *Glomar Explorer* plausibly could be used for either of these two quite different purposes. If so, it does not take much imagination to speculate about other conceivable uses to which such a capacity could be put. For example, a vessel of this type perhaps could be used to tap a communications cable traversing the ocean floor for the purpose of intercepting communications carried by that cable. Such a vessel perhaps could install or repair some type of permanent subsea installation which might be used to monitor the comings and goings of ships and submarines. Or, perhaps such a ship could be used to construct the underwater equivalent of a missile silo.

What should be obvious is that if it is both plausible that the *Glomar Explorer* was designed to mine the seabed and at the same time also plausible that the *Glomar Explorer* was designed to raise a Russian submarine, it is plausible that the *Glomar Explorer* was in fact designed to perform yet some still-secret third function. Someday, when the story is safe to tell, we may discover, in the words of Time Magazine, "that raising a Soviet submarine was not [the *Glomar Explorer*'s] mission at all, but the supreme cover for a secret mission as yet safely secure." [81]

And even if the true purpose of the mission was in fact to raise a submarine from the floor of the ocean, there may be some advantage in leaving the Soviet intelligence

77. *Id.* at 43.

78. *Id.*

79. *Id.* at 43 n.20.

80. *Id.* at 46.

81. The Great Submarine Snatch, TIME, 31 March 1975, at 20, *reprinted in* J.A. at 15.

agencies with lingering doubts whether some other purpose motivated the project. Whatever the truth may be, it remains either unrevealed or unconfirmed.[82] We cannot assume, as the appellants would have us, that the CIA has nothing left to hide. To the contrary, the record before us suggests either that the CIA still has something to hide or that it wishes to hide from our adversaries the fact that it has nothing to hide.

The key premise on which the appellants base their argument—that "the cat is already out of the bag"—is unsupported by the record and contrary to the government's affidavits. The government's affidavits are entitled to substantial weight. There is no indication of bad faith on the government's part in the record; to the contrary, there is every indication that the government has attempted to comply with the appellants' requests to the maximum extent consistent with national security by releasing, for example, over two thousand pages of documents in this sensitive area.

The affidavits supplied by the government provide an understandable and plausible basis for the government's Exemption 1 claims. In *Baez v. Department of Justice*,[83] this court stated that "if the description in the affidavits demonstrates that the information logically falls within the claimed exemption and if the information is neither controverted by contrary evidence in the record nor by evidence of agency bad faith, then summary judgment for the government is warranted."[84] The appellants in this case have shown neither "contrary evidence" nor "bad faith." We therefore affirm the district court's conclusion that this category of information is exempt from disclosure under the Freedom of Information Act.

### D. *Dates on Which Certain* Glomar Explorer *Activities Were Conducted*[85]

■ The government's reasons for refusing to disclose this information are contained in part in the First Zellmer Affidavit:

> Certain dates, if disclosed, will reveal the CIA's method of covert funding of an intelligence operation by pinpointing specific times when substantial amounts of money were transferred from the federal government to the contractors. These dates, if revealed, could lead to the disclosure of the financial institutions which were involved and would thus disclose the CIA's method of covert funding. (See affidavit of Mr. Yale.)
>
> The other instances in which dates were deleted were in the Program Master Schedule in Contract No. S–GM–4000 and further operational schedules dates in Contract HU–0900. The revelation of these programs and schedules for deployment of the ship for testing and operating would set forth specific locations of the ship at given dates, and indicate details of technical and operational capabilities bearing on the purpose of the mission.[86]

The Yale Affidavit to which the First Zellmer Affidavit refers is quite detailed and too lengthy to reprint in full here. But it is worth excerpting the most material portions:

---

**82.** We cannot credit the passage in the French edition of Colby's book as an official confirmation. If we view this event from the point of view of an espionage analyst working for an adversary of the United States, it might seem passing strange that Colby, a former Director of Central Intelligence, should put in a manuscript submitted to a New York publisher information that would reveal anything important and hitherto undisclosed, and that this information should be cleansed from the manuscript by the CIA, but only after publication in a French version. Looking at this event rather quizzically, a foreign analyst might suspect that Colby's lapse was not a lapse at all. In fact, maybe it was not. Without official confirmation, a foreign intelligence organization could not be sure.

**83.** 647 F.2d 1328 (D.C.Cir., 1980).

**84.** *Id.*, at 1335.

**85.** This category of information was referred to by the letter "G" in the Second Zellmer Affidavit.

**86.** First Zellmer Affidavit at 6–7, *reprinted in* J.A. at 225–26.

Without secrecy in the attendant funding there is no chance that the secrecy of programs themselves can be maintained. Knowing the direction and volume of money flow can be every bit as revealing as knowing the commitment of manpower or hardware to a particular program. Knowledge of the fact that a certain dollar figure is being expended pursuant to a contract with a certain corporation, or division of a corporation, is often enough to reveal the nature of the project being undertaken. By way of example drawn from the circumstances of this litigation, it can be readily seen that public disclosure of the fact that the United States Government was engaged in a contract with a company by the name of Global Marine, Inc., or that large amounts of "drill string" were being purchased on behalf of the United States Government, would quickly lead to discovery and disclosure of the project itself.

What may not be as readily seen, or what might be lost sight of in view of the limited disclosure regarding the Glomar Explorer Project that has taken place, is that the methods and procedures employed in accomplishing expenditures without government attribution must be safeguarded as well as the objects of these expenditures. The significance of this point is that it involves, not the success of a single secret project, but the success of all such projects. When a program is undertaken, the success of which depends on there being no attribution of any facet of the program to the United States Government, funds in support of the program must be moved in a manner such that their movement cannot be traced to their actual origin, i. e., the Treasury of the United States. . . . in order not to draw attention to the fact that something extraordinary is occurring, normal commercial practice must be employed as far as possible. Security procedures normally associated with the handling of "classified" information by the Government cannot be employed in the commercial world without drawing attention to the fact that it is a Government

transaction, which is obviously self-defeating. Therefore, the security of the requisite financial transactions is made to depend on their being indistinguishable from the thousands of ordinary transactions with which they are enmeshed. In effect, the sensitive transactions are lost against the background of normal commercial traffic, and the ability to follow the trail of these sensitive transactions is possessed by only a few witting individuals who participated in this process. In the instant case, for the reasons set forth above, payments of the sums prescribed in the contracts were not made directly from the United States Government to the contractors. Rather, several intermediaries, individual and institutional, were used to conceal the true source of funds. While steps are thus taken to break the payor-payee chain, the chain of transactions, including the identities of the intermediaries used, could be laid bare by matching dates and amounts paid against the record of the payee contractor. . . .

If the records in this case were released in their entirety, any person gaining access to them could determine the precise times at which particular amounts were paid and thus discover the sensitive channels used in these transactions. The records would identify a named bank as the depository of the Hughes Tool Company. The pertinent bank records are accessible to both bank employees and employees of the bank regulatory agencies, who, knowing what they were looking for, could identify the particular intermediary who effected the payment. Thus, in effect, a key to unlocking some very sensitive information would be placed in the hands of individuals not authorized to receive such information and over whom there is no control from a national security standpoint. . . .

. . . The trail of financial transactions could also surface other CIA sponsored transactions, past or present. At this point the damage to operations of the Central Intelligence Agency would be difficult, or impossible, to contain. . . .

[T]hese funding arrangements have not been used for the "Glomar Explorer" program alone. Financial trails associated with these financial transactions could lead to the identification of sensitive operations of the Central Intelligence Agency other than the one which is the subject of this lawsuit.[87]

The appellants' response to the detailed explanation provided in the Yale Affidavit—only a portion of which was excerpted here—amounts to a little more than speculation and conjecture. They argue once again, now in a different context, that the information the CIA seeks to withhold is in fact already in the public domain because the identity of the Hughes Tool Company's bank was not concealed at the time of the *Glomar Explorer* project. Therefore, they claim, disclosure of the information they seek would add nothing to the ability of bank or regulatory agency employees to uncover the secret transactions involved.

To say the least, this argument is implausible. It is public knowledge that the Hughes Tool Company was engaged in a secret operation which required that secret financial transactions be mixed with the usual transactions connected with the company's ordinary commercial business. But sorting from among all the myriad credits and debits charged to the Hughes Tool Company's accounts those that are related to the company's secret operations undoubtedly presents the intelligence analyst with a staggering task—unless he has more information at his disposal.

As the Yale Affidavit reveals, the CIA relies on the large number of normal transactions to protect the secrecy of the few secret transactions occurring at the same time. It is a matter of simple common sense that the intelligence analyst's task is made simpler if he knows at the outset on which dates secret transactions took place. He then knows that transactions occurring on other dates were normal commercial operations he can ignore. With enough dates and enough transactions an analyst could begin to piece together a set of probabilities that certain transactions involved covert operations. Together with information obtained from other sources, or perhaps by itself, this information might be enough to crack the system used by the Agency to shield its secret financial dealings from view.

Even without the assertions of the Yale Affidavit, made by an individual who, as Director of Finance for the CIA, is in a position to know, it would seem obvious that a foreign intelligence agency would be in a better position to crack the CIA's funding system if it knew the dates on which secret transactions took place than it would be if it did not have this information. The appellants have not provided even a plausible argument to the contrary. Certainly they have not overcome the "substantial weight" we must give to the affidavits of the defendants.

We therefore affirm the district court's finding that summary judgment is warranted for this class of information on the basis of the affidavits provided by the defendants.

### E. *Locations of Classified CIA Installations* [88]

■ The government's basis for withholding this information is set out in the First Zellmer Affidavit: "the disclosure of the installation would reveal the identity of another company besides Summa Corp., Hughes Tool Company, and Global Marine, Inc., who worked with the CIA in confidence on the Project and who was the ostensible lessor of this particular site. To reveal the identity of this company would reveal the identity of an intelligence source and jeopardize current and future intelligence operations . . . . " [89] The basis for the deletion of this information is thus that it

---

87. Yale Affidavit at 2–6, *reprinted in* J.A. at 238–42.

88. This category of information was given the letter "H" in the Second Zellmer Affidavit.

89. First Zellmer Affidavit at 7, *reprinted in* J.A. at 226.

would disclose the identity of a secret contractor.

The appellants' argument that this information is not covered by Exemption 1 or Exemption 3 is based on their conclusion that the government no longer has a right to withhold the identities of secret contractors who worked on the *Glomar Explorer* project. Because we have concluded above [90] that the identity of previously undisclosed secret contractors is properly withheld under Exemption 1, however, we must find that this category of information is also exempt. We therefore affirm the district court's grant of summary judgment for the defendants with regard to this category of information.

### F. Cryptonyms [91]

■ The reasons for the government's claim of exemption for this category of information were set out in First Zellmer Affidavit as follows:

> Cryptonyms are devised words that serve as a substitute for the identity of an activity or particular project, and are utilized as a defensive mechanism against unauthorized disclosure. A cryptonym carries significant meaning for those who are able to fit it into the proper cognitive framework and disclosure can only serve to endanger the protection afforded to intelligence sources and methods. If a document is lost or stolen, the use of cryptonyms prevents the breach of security from being more serious than it might otherwise be. The release of cryptonyms makes it possible to fit disparate pieces together and devine [sic] the nature or purpose of a project that may stand behind the cryptonym. In some instances the factual setting within which the cryptonyms appear is of such a descriptive nature that the documents could reveal to the knowledgeable reader the true identity of activity or project protected. [92]

The appellants do not seek disclosure of the cryptonyms themselves. [93] They do seek, however, any information hidden behind the shield of a cryptonym which would otherwise be subject to disclosure under their FOIA request. In other words, the appellants merely suggest that information not properly classified cannot be withheld simply because it has been obscured by a classified cryptonym.

The appellants, however, have not provided any grounds whatever for doubting the accuracy of the government affidavits affirming that the information shielded by cryptonyms has been properly classified. We therefore affirm the district court's grant of summary judgment for the government with respect to this category of information.

### G. Information Which Would Identify Certain U.S. Government Agencies or Their Employees Which Could, in turn, Compromise Sensitive Intelligence Activities [94]

■ The government's basis for withholding this category of information was set forth in the First Zellmer Affidavit:

> The names and identifying data of many present and former government officials and the identity of one government entity, the very existence of which is classified, has been deleted from the documents in this case. To reveal the name of a classified government entity would, of course, compromise its classified work. To reveal the names of those government officials, not associated with the CIA, who were involved in the HGE project, would signal to the world that these persons were and/or are engaged in highly sensitive intelligence activities and could lead to exposure of their cover and

---

90. *See* notes 55 to 63 and accompanying text *supra*.

91. This category of information was referred to by the letter "J" in the Second Zellmer Affidavit.

92. First Zellmer Affidavit at 8, *reprinted in* J.A. at 227.

93. Brief for Appellants at 48.

94. This category of information was given the letter "K" in the Second Zellmer Affidavit.

the cover used by a classified government entity.[95]

In response, the appellants argue only that: "a brief, passing reference to such an unprecedented concept as a secret agency of the United States government is insufficient to establish defendants' right to withhold any and all information concerning such an agency's identity, functions, or role in the Glomar Explorer project."[96]

The appellants' argument is conclusory. For reasons given elsewhere in this opinion, we have upheld the district court's determination that documents that might disclose the names, initials, pseudonyms and official titles of CIA personnel[97] as well as documents that might disclose the identities of corporations involved in the *Glomar Explorer* project (other than those whose participation has already been officially acknowledged)[98] are properly withheld by the government. The basis for that conclusion obviously applies *a fortiori* to individuals and entities associated with an agency whose very existence is classified. The appellants' conclusory suggestion to the contrary in no way undercuts this conclusion. We therefore affirm the district court's grant of summary judgment to the defendants with regard to this category of information.

H. *Dollar Amounts, or Derivative Data (Hours or Rates) Which Could Reveal Dollar Amounts Spent in Connection with the* Glomar Explorer *Project*[99]

■ The government's basis for withholding documents in this category is found in the Turner Affidavit, a detailed document too long to reproduce here in full. The most salient and pertinent portions state that:

It has been publicly disclosed that the annual CIA appropriation is contained in the annual appropriations to the Department of Defense, and that the funds involved are made available to the CIA under the transfer-of-appropriation provisions of the CIA Act of 1949. The annual CIA budget, however, is not now and never has been a matter of public knowledge. Neither have the details of that budget ever been matters of public knowledge. The nondisclosure of this information has a long record of approval by the Congress. . . . Both the Senate and House of Representatives have repeatedly rejected legislation that would have required the publication of the aggregate budget for the Intelligence Community or publication of the CIA budget. . . . And information which discloses detailed breakdown of expenditures made in connection with one specific intelligence operation, which this FOIA lawsuit involves, requires even greater protection in the interests of national security. Release of this information would be a valuable benefit to an intelligence service of a foreign country in that it would permit deductions to be made concerning the state of the art of intelligence collection in a certain area and the importance the United States attributed to particular collection activities. The existence of the technologies on which we depend, and to the level of their sophistication, could be compromised by such disclosure, and the risk of foreign countermeasures to nullify our advantage could be enhanced.[100]

In response to this argument, the appellants reiterate their by now familiar argument that "given the preexisting *official* disclosures of the detailed technical features and operational capabilities of the Glomar Explorer which plaintiffs have already described and documented, releasing

---

**95.** First Zellmer Affidavit at 8–9, *reprinted in* J.A. at 227–28.

**96.** Brief for Appellants at 49.

**97.** *See* notes 50 to 54 and accompanying text *supra*.

**98.** *See* notes 55 to 63 and accompanying text *supra*.

**99.** This category of information was given the letter "L" in the Second Zellmer Affidavit.

**100.** Turner Affidavit at 4–5, *reprinted in* J.A. at 232–33.

the costs of the Glomar Explorer project would add nothing to anyone's ability to discern what is the state of the art and level of sophistication of the United States' intelligence capabilities embodied in the Glomar Explorer." [101] But as we have concluded above,[102] it is far from clear that either the purpose of the *Glomar Explorer* mission or the technology used to accomplish that mission are in fact known. We have been given two stories which purport to explain the *Glomar Explorer*'s mission: first, we were told the *Glomar Explorer* was designed to mine manganese nodules from the ocean floor, and then, we were told that it was designed to lift a Russian submarine. Both stories, though very different, were plausible. The truth may lie in yet a third direction. In sum, neither we nor the appellants can be sure we know what intelligence capabilities and purposes were embodied in the *Glomar Explorer*. Therefore, we affirm the district court's grant of summary judgment for the defendants with respect to this category of information as well.

### I. *Information Pertaining to Methods Employed To Provide Secret Funding of the* Glomar Explorer *Project* [103]

■ The defendants rely on the Yale Affidavit to establish their right to withhold this category of information. The Yale Affidavit in pertinent part has already been discussed at some length above in connection with a closely related category of information: the dates on which certain *Glomar Explorer* activities were conducted. In short, the Yale Affidavit shows that revelation of the dates in question could lead an intelligence analyst to deduce the

methods employed by the Agency in the secret funding of secret projects undertaken in the national interest. Having already concluded [104] that the Yale Affidavit is sufficient to support the district court's grant of summary judgment regarding the dates withheld from the appellants by the government, we must conclude *a fortiori* that the government is entitled to withhold the information whose continued secrecy required that the dates be withheld. For the same reasons given above, then, we affirm the district court with respect to its grant of summary judgment for the defendants concerning information pertaining to the methods employed to provide secret funding of the *Glomar Explorer* project.

### IV. THE TRIAL COURT'S REFUSAL TO PERMIT DISCOVERY

■ The appellants next argue that even if the government were entitled to summary judgment on the present state of the record, the trial judge abused his discretion in refusing to permit them to conduct discovery before he ruled on the defendants' summary judgment motion.[105] Had discovery been permitted, they contend, they may have been able to uncover evidence sufficient to controvert the government's affidavits and thereby have avoided the award of summary judgment against them.

After careful consideration of this contention, we find no abuse by the trial court of its discretion.[106] In support of their view the appellants argue that "the substantial questions which plaintiffs' filings raised concerning the substantive content of the affidavits relied upon by defendants ... demonstrated the need for discovery con-

---

101. Brief for Appellants at 51–52.

102. *See* notes 64 to 84 and accompanying text *supra.*

103. The information in this category was given the letter designation "M" in the Second Zellmer Affidavit.

104. *See* text accompanying notes 85 to 87 *supra.*

105. Brief for Appellants at 25-27; Reply Brief for Appellants at 24–28.

106. The appellants do not suggest that the question whether to disallow discovery is not within the sound direction of the trial court. *See, e. g., Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978) ("the district court has discretion to forgo discovery and award summary judgment on the basis of the affidavits"), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

cerning the underlying bases for the conclusions expressed in the affidavits."[107] To satisfy this "need," for example, the appellants wanted to question Secretary of State Vance's belief and judgment as expressed in his affidavit that confirmation or denial of news reports about the *Glomar Explorer* could cause harm to the national security.[108] As another example, they wanted to question the other affiants, including the Director of Central Intelligence, CIA Director of Finance Yale and CIA Deputy Director of the Directorate of Science and Technology Zellmer, about whether the adverse consequences predicted by the affidavits "ha[d] ever happened."[109] In concluding their motion to the trial court for authorization to take the depositions of the government's affiants, the appellants summed up their position as follows: "when the government attempts to make a record based on self-serving, conclusory assertions, the federal rules ... require allowing plaintiffs to test those assertions by way of deposition."[110]

We part company with the appellants because we do not share their premise that the government's assertions were inadequate to the task, let alone "conclusory." Had we been persuaded by the appellants' principal contention that so much already is known about the *Glomar Explorer* as to render the government's representations it has something left to hide inherently implausible, we might have reached a different conclusion on the issue of discovery. But we have rejected this line of argument.[111] We do not agree that the appellants succeeded in raising "substantial questions ... concerning the substantive content of the affidavits relied upon by defendants,"[112] so we must conclude the trial court did not abuse its discretion in denying them "discovery concerning the underlying bases for the conclusions expressed in the affidavits";[113] having rejected the premise, we are forced to reject the conclusion.

We are well aware of the advantages of adversary procedures in testing the strength of the government's position in FOIA cases—even those involving claims of secrecy.[114] Nonetheless, the basic purpose of Exemption 1 of the Act is to ensure that FOIA requests will not result in the disclosure of sensitive materials if a court has satisfied itself that the materials have been properly classified. In national security cases, some sacrifice to the ideals of the full adversary process are inevitable.[115] It is natural that the appellants should seek discovery in the hope that they might turn up details of the government's position that might be turned to the appellant's advantage. In national security cases, however, more detailed information itself may compromise intelligence methods and sources.[116]

In the circumstances of the present case, we cannot find that the trial court abused its discretion in denying discovery to the appellants, when it appears that discovery would only have afforded an opportunity to

107. Reply Brief for Appellants at 27.

108. Plaintiffs' Motion for a Continuance Pursuant to Rule 56(f) at 3–4, *Military Audit Project v. Turner*, No. 75–2103 (D.D.C., filed 27 April 1979), *reprinted in* Brief for Appellees at app. 3a, 5a–6a.

109. *Id.* at 4, *reprinted in* Brief for Appellants at app. 6a.

110. *Id.* at 6, *reprinted in* Brief for Appellants at app. 8a.

111. *See, e. g.,* text and accompanying notes 80 to 83 *supra.*

112. Reply Brief for Appellants at 27.

113. *Id.*

114. *See Founding Church of Scientology v. NSA*, 610 F.2d 824, 832–33 (D.C.Cir.1979); *Cuneo v. Schlesinger*, 484 F.2d 1086, 1091–92 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974); *Vaughn v. Rosen*, 484 F.2d 820, 823–26, 828 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

115. *Hayden v. NSA/Central Security Serv.*, 608 F.2d 1381, 1385 (D.C.Cir.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

116. *Baez v. United States Dep't of Justice*, at 1336 (D.C.Cir.1980); *Lesar v. United States Dep't of Justice*, 636 F.2d 472, 482 (D.C.Cir. 1980).

pursue a "bare hope of falling upon something that might impugn the affidavits." [117]

## V. CONCLUDING OVERALL ANALYSIS

With the category-by-category analysis of the information at issue in this case behind us, we are now in a better position to comment more fully on two arguments by the appellants that are not limited to a particular deleted category and its accompanying affidavit.

### A. Does Partial Disclosure of an Intelligence Mission Render Implausible the Claim that Full Disclosure Would Harm the National Security?

Throughout their briefs, the appellants suggest that affirmance by us of the district court's grant of summary judgment would be tantamount to a subversion of the statutory requirement that courts conduct *de novo* review of agency classification decisions. An affirmance, they claim, would *de facto* substitute the more deferential "reasonable basis" standard rejected by Congress over a presidential veto in 1974.[118] This is simply not so.

It is well established that summary judgment is properly granted in Exemption 1 cases without an *in camera* inspection or discovery by the plaintiffs when the affidavits submitted by the agency are adequate to the task.[119] We agree with the district court that the lengthy, detailed affidavits submitted by the defendants in this case satisfy the well-settled requirements for summary judgment. They describe the sensitive documents at issue with reasonably specific detail; the justifications for nondisclosure are detailed and persuasive; the affidavits plainly demonstrate that the information withheld logically falls within the claimed exemption; and far from there being evidence of agency bad faith, in this case the available evidence is that the agency acted in good faith, to the extent that, when it became possible to do so, it declassi-

fied and released more than two thousand pages of documentation previously withheld from the plaintiffs. Summary judgment for the defendants was therefore appropriate on the basis of our precedents.

The principal claim advanced by the appellants in opposition to the trial court's grant of summary judgment is that there is evidence in the record that controverts the assertions in the affidavits. But, as our category-by-category analysis shows, such is not the case. The contrary evidence on which the appellants rely consists solely of the published reports about the *Glomar Explorer* project and the few official disclosures that already have been made. From this base, the appellants launch the argument that because *some* information about the project ostensibly is now in the public domain, *nothing* about the project in which the appellants have expressed an interest can properly remain classified. This theme is replayed with modest variations throughout the appellants' submissions to this court: because *some* of the previously-classified facts about the technological capabilities of the *Glomar Explorer* are now known, there is no danger to national security in revealing *everything* about the *Glomar's* abilities; because *some* of the contractors who did work on the project are known, there is no danger in revealing the identities of *all* who worked on the project; because the government has revealed *some* documents it previously considered too sensitive to release, it now must reveal *all*.

At the least, the appellants urge us to decide that whatever revelations there have been to date undercut the government's affidavits in this case to the extent that summary judgment is no longer proper. And the appellants' logic would appear to require us to decide that summary judgment on the basis of agency affidavits alone cannot be appropriate in an Exemption 1 case in which the public has, or thinks it has, partial knowledge of the outlines of a classified undertaking.

---

**117.** *Founding Church of Scientology v. NSA,* 610 F.2d 824, 836–37 n.101 (D.C.Cir.1979).

**118.** Brief for Appellants at 17, 28–30; Reply Brief for Appellants *passim.*

**119.** *See* cases cited note 49 *supra.*

We reject this suggestion. We so rule without undue deference to the agency's position in this or any other case, as the history of this litigation should suggest. We are not acquiescing here in a jettisoning by the district court of the statutory requirement of *de novo* review. We simply do not believe the appellants have made the showing required to justify reversing the district court's grant of summary judgment for the defendants because we agree with the district court that they have failed in their effort to draw the affidavits of the government into question.

This is not the first case in which arguments of the type advanced by the appellants have been made. In *Halperin v. Department of State*,[120] for example, the district court ordered the release of a transcript of a background press conference held by the Secretary of State. On appeal, we found that the press conference excerpts sought had not even been properly classified in accordance with the applicable executive order. Moreover, we noted that the substance of the Secretary's remarks were not at issue, but only the attribution of those remarks to the Secretary; the press conference had been attended by thirty domestic and foreign representatives of the media, none of whom had a security clearance. The information at issue was therefore all public knowledge *except* for *official* confirmation that it was attributable to the Secretary of State. Even in these rather extreme circumstances, directly in the face of a failure by the Department of State to "effect the classification of the document in the only way which legally qualified it for the exemption," [121] we nonetheless stayed the judgment of the district court and remanded the case for consideration of the national security interest at stake.

*Hayden v. National Security Agency/Central Security Service* [122] provides an-

other and more recent example of our rejection of the argument that an agency's rationale for nondisclosure is inherently implausible simply because the information at issue might already be a matter of public knowledge. In that case the NSA sought to conceal the fact that it had intercepted certain channels of communication by refusing to reveal messages obtained by means of such intercepts. The appellants argued that some of the channels monitored by the NSA are known to be under close scrutiny, that as a result no foreign government would send sensitive information over them, and that consequently the NSA could safely reveal information obtained from those channels.[123] We rejected this argument in affirming the district court's grant of summary judgment for the agency. Our explanation for our rejection of the argument in that case also applies to the present case:

> The Agency states that to reveal which channels it monitors would impair its mission; this is by no means an illogical or implausible assertion; indeed, it appears inherently logical that this assertion is true, although as a court we are not called upon to make such final determination. This is precisely the sort of situation where Congress intended reviewing courts to respect the expertise of an agency; for us to insist that the Agency's rationale here is implausible would be to overstep the proper limits of the judicial role in FOIA review.[124]

B. *Does an Agency Change of Heart and Consequent Partial Document Release Render Implausible the Agency's Reasons for Refusing Full Release?*

The appellants have contended at length that the Agency's decision about midway

---

**120.** 565 F.2d 699 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1046, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978).

**121.** *Id.* at 706.

**122.** 608 F.2d 1381 (D.C.Cir.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

**123.** *Id.* at 1388.

**124.** In *Hayden* the district court received both public and sealed affidavits for *in camera* inspection, but did not inspect the contested documents themselves.

through the extended course of this litigation to declassify over two thousand pages of documents at the behest of the appellants vitiates the agency's continuing claims against the release of the remaining information. The appellants point out that the arguments the agency is using to justify nondisclosure are the same now as before the declassification. By releasing information to us, argue the appellants, the agency admitted that it was initially in error, from which it follows that the agency is fallible, and its affidavits, suspect.[125] Summary judgment was therefore unwarranted on the basis of those affidavits alone.[126]

We emphatically reject this line of argument. If accepted, it would work mischief in the future by creating a disincentive for an agency to reappraise its position, and when appropriate, release documents previously withheld. It would be unwise for us to punish flexibility, lest we provide the motivation for intransigence.

Furthermore, this argument is based on the perverse theory that a forthcoming agency is less to be trusted in its allegations than an unyielding agency. The release of over two thousand pages of documents after a thorough review suggests to us a stronger, rather than a weaker, basis for the classification of those documents still withheld. During the course of this litigation, those documents have been considered too sensitive for release by the CIA under three Directors and as many Presidents. We find the agency's case strengthened by the massive declassification of documents it undertook at the appellants' behest.

## VI. CONCLUSION

In sum, we find the extensive affidavits submitted by the government to satisfy the requirements for summary judgment under Exemption 1, and we hold that the trial court did not abuse its discretion by refusing to permit the appellants to conduct discovery before ruling on the government's motion for summary judgment. Accordingly, the judgment of the district court is

*Affirmed.*

---

**125.** Brief for Appellants at 16, 25, 27; Reply Brief for Appellants at 9–13.

**126.** The appellants further note that the government has failed to adduce evidence of specific harm of the type originally predicted, following in the wake of the declassification of the 2,000 pages released to the appellants.

This we are urged to believe, renders implausible the government's affidavits which predict harm should the remaining documents be released. We have already dealt with arguments of this sort. *See* text and accompanying notes 58 to 63 *supra.*