**DAILY ORANGE CORPORATION, et al., Plaintiffs,**

v.

**CENTRAL INTELLIGENCE AGENCY, et al., Defendants.**

No. 79–CV–441.

United States District Court, N. D. New York.

Feb. 18, 1982.

As Amended March 18, 1982.

Syracuse University, College of Law, Syracuse, N.Y., for plaintiffs; Daan Braveman, Gary T. Kelder, Syracuse, N.Y., of counsel.

George Lowe, U. S. Atty., Syracuse, N.Y., for defendants; Gustave Dibianco, Asst. U. S. Atty., Syracuse, N.Y., of counsel.

Alice Daniel, Asst. Atty. Gen., Victoria L. Bleiberg, Dept. of Justice, Washington, D.C., for defendants; Vincent M. Garvey, Daniel J. Metcalfe, Washington, D.C., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief District Judge.

On August 25, 1981, this Court issued a Memorandum-Decision and Order granting partial summary judgment for defendants. In denying part of their motion, the Court ordered the Central Intelligence Agency [CIA] to submit an affidavit in camera supporting its claim that the covert activity information requested by plaintiffs, if it exists, has "in fact" been properly classified under Executive Order 12,065, 3 C.F.R. 190 (1979), and exemption (b)(1) of the Freedom of Information Act [FOIA], 5 U.S.C. § 552(b)(1) (1976). *See* Memorandum-Decision and Order of 25 August 1981, at 13, 26. The agency recently submitted its affidavit. Upon reviewing that document, as well as the previous affidavits filed and made public in this case, the Court determines that summary judgment is proper for the defendants on the covert activity issue.

## I.

 In its August opinion, the Court identified (b)(1) of the FOIA, 5 U.S.C. § 552(b)(1) (1976), as the appropriate exemption governing this issue. The exemption authorizes an agency to withhold any information that is "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) [is] in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1) (1976).

The CIA claims that it can neither confirm nor deny the existence of any covert activity at Syracuse University because the fact of such activity's existence or non-existence is itself protected under Executive Order 12,065. Executive Order 12,065, § 3–505, 3 C.F.R. 190, 199 (1979) ("No agency in possession of a classified document may, in response to a request for the document made under the Freedom of Information Act. . ., refuse to confirm the existence or non-existence of the document, unless the fact of its existence or non-existence would itself be classifiable under this Order."). No information may be considered for classification unless it falls within one or more of seven specified categories. *Id.* § 1–301, 3 C.F.R. 190, 193 (1979). At least two categories would clearly apply to covert activity at Syracuse, if it exists: 1–301(c), concerning "intelligence activities, sources, or methods"; and 1–301(e), involving "scientific, technological, or economic matters relating to the national security." *Id.* For purposes of section 552(b)(1) and the Order, such information is in fact properly classified only if disclosure "reasonably could be expected to cause at least identifiable damage to the national security." *Id.* § 1–302, 3 C.F.R. 190, 193 (1979).[1] The issue, then is whether a statement by the CIA either confirming or denying the existence of covert activity at Syracuse University reasonably could be expected to cause at least identifiable damage to the national security.

The Court agrees with the CIA's contention that it could. Defendants' explanation is plausible and non-conclusory. The CIA considers its academic contacts "vital sources of intelligence." Affidavit of Don I. Wortman, Deputy Director for Administration and Chairman of the CIA's Information Review Committee, 14 March 1980, at ¶ 10 [Wortman Aff.]. The types of covert, or confidential, information that the agency gathers from universities and colleges include the following: 1) "foreign intelligence information" collected "from persons who have travelled abroad" and from various experts; 2) "confidential contacts" with university personnel to assist "the recruitment of non-Americans as foreign intelligence sources"; and 3) contractual and consultative information in areas of foreign policy and scientific research and development. *Id.* ¶s 6, 7.

"[A]ny documents that would evidence a convert CIA-academic relationship at a particular university would be duly classified in accordance with the requirements of Executive Order 12065 . . ." *Id.* ¶ 13. Wortman explains why the CIA feels it must refuse to confirm or deny the existence of covert activities: "Any other response would have the effect of divulging the very secrets the CIA is directed to protect." *Id.* ¶ 14. The Wortman affidavit continues:

> The academic community is currently the scene of efforts by some activists to prevent the CIA from maintaining any contacts therein. If we were to adopt the practice of official acknowledgment of covert CIA contacts at a particular campus, we must surely anticipate active and abrasive campaigns to discover and expose cooperating individuals at such institutions.
>
> . . . Besides the obvious problems of harassment and resulting discontinuance of source cooperation, acknowledgment of covert CIA involvement at a university

1. *See also* Exec. Order 12,065, § 6–102, 3 C.F.R. 190, 204 (1979), defining "classified information" as "information or material . . . produced for or by . . . the United States

Government . . . that has been determined pursuant to this Order . . . to require protection against unauthorized disclosure."

could damage the national security and cause severe counterintelligence problems. If a hostile foreign intelligence service were to learn through officially released CIA information that the Agency had covert relationships with academics, programs, or students at a particular American university, the intelligence service might attempt to ascertain the extent of the relationship, the nature of the information exchanged, the amount of cooperation involved, etc. Such an acknowledgment would make the university an intelligence target for that foreign intelligence service. In the case of DCD [Domestic Collection Division], for example, if it were to become publicly known that [the] CIA interviews faculty members at specifically identified universities upon their return from overseas conferences, damaging repercussions could occur: (1) faculty members could become barred from attending certain conferences, especially in Communist bloc countries, if their cooperation with [the] CIA became suspected, thus eliminating a vital CIA intelligence source; and (2) faculty members could become targets of disinformation campaigns by hostile foreign intelligence services, in which case they would return to provide the United States with inaccurate reports, which could alter [the] CIA's analyses, thus harming the national security. In the case of FR [Foreign Resources Division], which has the generally known purpose of contacting foreign students so that when that student returns to his home country he will be disposed to American interests, damaging repercussions both for the United States and possibly innocent foreign students could occur if [the] CIA officially acknowledged that it conducts intelligence recruiting at specific university campuses. If a foreign student's home government were to learn that FR conducts operations at specific campuses then: (1) the foreign government could locate the students who attended that university and attempt to ascertain whether or not the student had cooperated with [the] CIA; (2) could en-

sure that students who attended certain campuses who were suspect did not enter authoritative government positions; (3) and in certain countries possibly even imprison or otherwise harm students who were suspect. Furthermore, if a foreign government were to learn through official CIA disclosure that FR operates at a specific university, it would be an easy matter for that government to discontinue sponsoring its students at that school. Such events would severely hamper the mission of the Central Intelligence Agency, which, pursuant to statute and Executive Order, is to collect and disseminate foreign intelligence. Finally, these services might also attempt to recruit intelligence sources at the university in order to use them to find out what types of relationships [the] CIA has at the university or to provide them with the results of the research that has been undertaken on the CIA's behalf.

*Id.* ¶s 11–12.

The Court finds the justification reasonable. Moreover, acknowledgement of covert activities at Syracuse University reasonably can be expected to increase reluctance to cooperate with the CIA in the future. *Halperin v. Central Intelligence Agency,* 629 F.2d 144, 149 (D.C.Cir.1980), recognized this reluctance to assist the CIA as a basis for agency nondisclosure. *See also Gardels v. Central Intelligence Agency,* 510 F.Supp. 977, 978–79 (D.D.C.1981), *appeal docketed,* No. 81–1567 (D.C.Cir. June 15, 1981). *Cf. Military Audit Project v. Casey,* 656 F.2d 724, 741 (D.C.Cir.1981) (upholding CIA's reason for non-disclosure that revealing identities of secret CIA contractors in *Glomar Explorer* project would make other contractors more reluctant to assist future CIA projects).

To deny the existence of covert activities at Syracuse also reasonably could be expected to damage national security. To date, "the CIA has received approximately 135 [FOIA] requests seeking information on its relationships with at least 100 universities." Affidavit of Louis J. Dube, Information Review Officer for the CIA's Directorate of

**126**

Operations, 7 May 1981, at ¶ 7. Because of these numerous requests, the agency's denial of covert activities at particular universities or colleges could, by a process of elimination, result in the ultimate identification of those academic institutions where the CIA does maintain covert relationships. Wortman Aff. ¶ 14. Like the *Gardels* court, this Court refuses to view the Daily Orange's request in isolation. "[I]n the context of the totality of the 'university' requests, ... the CIA's response in connection with any one institution necessarily holds implications for all others." *Gardels, supra,* 510 F.Supp. at 979. *See also Halperin, supra,* 629 F.2d at 150: "[The court] must take into account ... that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself." The Wortman affidavit concludes that "[t]o the extent that Agency contacts with the academic community are diminished," either by acknowledging covert activities, or because of agency denials at certain institutions that ultimately point the finger of covert activity at other universities, "the national security is correspondingly damaged." Wortman Aff. ¶ 10.

The in camera affidavit strengthens the conclusion that the information here, if it exists, would be properly classifiable. More importantly, the affidavit satisfies this Court that the CIA has "in fact" properly classified the requested information, if it exists, pursuant to Executive Order 12,065's requirements. With this background, the Court proceeds to consider the agency's summary judgment motion on this issue.

## II.

*Military Audit Project, supra,* most recently reiterated the test for summary judgment in FOIA national security cases:

▮t is now well established that summary judgment on the basis of such agency affidavits is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.

656 F.2d at 738 (footnote omitted). *See also Baez v. United States Department of Justice,* 647 F.2d 1328, 1335 (D.C.Cir.1980); *Lesar v. United States Department of Justice,* 636 F.2d 472, 481 (D.C.Cir.1980). The court is to "determine the matter de novo, and ... the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B) (1976); *Baez, supra,* 647 F.2d at 1335.

The legislative history to the 1974 FOIA amendments nonetheless emphasizes that "the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse effects might occur as a result of public disclosure of a particular classified record." S.Rep.No.93–1200, 93d Cong., 2d sess. 12, *reprinted in* [1974] U.S.Code Cong. & Ad. News 6267, 6290. Therefore, courts are to accord "substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Id.* *See also Baez, supra,* 647 F.2d at 1335; *Lesar, supra,* 636 F.2d at 481.

▮ The affidavits here satisfy the *Military Audit Project* test. First, the affidavits detail the specific reasons underlying the agency's refusal to confirm or deny the existence of covert activity at Syracuse University. The *Gardels* court upheld affidavits very similar to the affidavits publicly filed in this case as sufficiently detailed to grant summary judgment for the CIA on this precise issue. 510 F.Supp. at 978–80.[2]

---

**2.** The *Gardels* court applied exemption (b)(3) of the FOIA, and did not reach the agency's claimed (b)(1) exemption. *Gardels v. Central Intelligence Agency,* 510 F.Supp. 977, 978 n.1 (D.D.C.1981). While this decision rests solely on the latter, the two exemptions contain simi-

lar requirements. The agency's demonstration that "release of the requested information can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods" satisfies the (b)(3) exemption. *Phillippi v. Central Intelligence Agency,* 546 F.2d 1009, 1015

The additional affidavit submitted in camera in this case adds to that detail.

Nor are the affidavits unduly speculative. Agency evaluations of threatened harm in national security FOIA cases are always speculative to the extent that they describe a potential future harm rather than actual past harm. *Halperin, supra,* 629 F.2d at 149. The *Halperin* court cautioned that a court reviewing such evaluations is only to decide whether the predicted danger is a reasonable expectation; we may not require the agency to identify concrete harm because of disclosure. *Id. See also Military Audit Project, supra,* 656 F.2d at 740–41. Such a requirement would be particularly ill-advised here, where, unlike other cases where the issue has been raised, no partial disclosure of covert activity has yet occurred.[3] The CIA's affidavits here satisfy *Halperin's* "reasonable expectation" test, accord with the requirements of section 1–302 of Executive Order 12,065, and thus comply with 5 U.S.C. § 552(b)(1) (1976).

Second, as discussed above, the affidavits show that the information withheld logically falls within the (b)(1) exemption. The public affidavits identify the damage to national security reasonably expected to oc-

cur if the CIA were to confirm or deny the existence of covert activity. The in camera affidavit reveals that the agency has in fact properly classified such information, if it exists, pursuant to the requirements of Executive Order 12,065 and 5 U.S.C. § 552(b)(1) (1976). Third, no evidence exists in the record to controvert the claimed exemption. Finally, there is no showing of agency bad faith.

The affidavits also satisfy the procedures set forth in *Phillippi v. Central Intelligence Agency,* 546 F.2d 1009, 1013 (D.C.Cir.1976), governing this kind of case. The *Phillippi* court advocated creating "as complete a public record as ... possible" before resorting to in camera review. *Id.* Here the CIA has submitted a public affidavit detailing its justification to refuse to confirm or deny the existence of covert activity at Syracuse University. Plaintiffs have challenged the agency's arguments in their memorandum of law opposing summary judgment, thus focusing the issues to be resolved. Only then did the Court order the agency to submit an in camera affidavit. Other recent decisions also have used an in camera affidavit review procedure in similar situations. *See, e.g., Weberman v. National Security Agency,* 668 F.2d 676 (2d Cir. 1982)

---

n.14 (D.C.Cir.1976); *Gardels, supra,* 510 F.Supp. at 978, 980. To satisfy the claimed (b)(1) exemptions here, the requested information, if it exists, must be properly classifiable and in fact properly classified, such that unauthorized disclosure reasonably could be expected to cause at least identifiable damage to national security. *Baez v. United States Dep't of Justice,* 647 F.2d 1328, 1334 (D.C.Cir.1980); *Moon v. Central Intelligence Agency,* 514 F.Supp. 836, 838 (S.D.N.Y.1981).

Moreover, the legislative history to the 1974 FOIA amendments indicates that material satisfying a (b)(3) exemption also qualifies for a (b)(1) exemption:

NATIONAL DEFENSE AND FOREIGN POLICY EXEMPTION (B)(1)

. . . . .

Restricted Data (42 U.S.C. 2162), communication information (18 U.S.C. 798), and intelligence sources and methods (50 U.S.C. 403(d)(3) and (g)), . . . may be classified and exempted under section 552(b)(3) of the Freedom of Information Act. When such information is subjected to court review, the court should recognize that if such information is classified pursuant to one of the above

statutes, it shall be exempted under this law. [*i.e.,* 5 U.S.C. § 552(b)(1)].
S.Rep.No.93–1200, 93d Cong., 2d Sess. 12, *reprinted in* [1974] U.S.Code Cong. & Ad.News 6267, 6290. Similarly, detailed affidavits sufficiently justifying an agency's refusal to confirm or deny the existence of covert activity to satisfy the (b)(3) exemption should also be sufficient to qualify for a (b)(1) exemption.

3. *See* defendant's reply memorandum in support of summary judgment, 30 May 1980, at 8; affidavit of Charles S. Phalen, CIA Deputy Director of Office of Security, 30 May 1980, at ¶ 7; affidavit of George L. Marling, Chief, Operations Group, Information Management Staff of the CIA's Directorate of Operations, 30 May 1980, at ¶ 6 (all attesting that documents previously released to Morton Halperin and Norman Balbanian do not reflect any covert CIA activity at Syracuse University). *Cf. Military Audit Project v. Casey,* 656 F.2d 724, 729 (D.C.Cir. 1981) (partial disclosure of CIA's *Glomar Explorer* Project). Even there, however, the court refused to require the agency to allege specific harms resulting from such disclosure. *Id.* at 740.

(upholding district court's ex parte inspection of in camera affidavit); *Allen v. Central Intelligence Agency,* 516 F.Supp. 653, 654 (D.D.C.1981); *Jaffe v. Central Intelligence Agency,* 516 F.Supp. 576, 583–84 (D.D.C.1981); *Moon v. Central Intelligence Agency,* 514 F.Supp. 836, 839 (S.D.N.Y. 1981).

Finally, the Court cautions against any implication that by submitting an in camera affidavit, the CIA necessarily admits that it maintains covert relationships with Syracuse University personnel. The holding here is simply that the very fact of the existence or nonexistence of covert activity at Syracuse University is itself classifiable under Executive Order 12,065 and therefore exempt from disclosure under 5 U.S.C. § 552(b)(1) (1976). The Court's August opinion only ordered the CIA to substantiate that the information requested is in fact properly classified under Executive Order 12,065 and the FOIA, *if such information exists.* The very purpose of in camera review here was to avoid disclosure of whether the CIA performs covert activities at Syracuse, as long as such information satisfied the applicable statutory requirements. The reader should not construe this opinion otherwise.

In sum, the Court concludes that once substantial weight is given to the CIA's affidavits, no material facts remain in dispute on this issue. Moreover, the Court decides as a matter of law that 5 U.S.C. § 552(b)(1) (1976) exempts defendants from the requirement of confirming or denying the existence of covert activities at Syracuse University, because such a statement reasonably could be expected to cause at least identifiable damage to national security. Accordingly, defendants are granted summary judgment on the covert activity issue. As stated in the Memorandum-Decision and Order of August 25, 1981, triable issues of fact still exist on other issues.

IT IS SO ORDERED.